## SATTAZAHN *v.* PENNSYLVANIA

No. 01–7574. Argued November 4, 2002—Decided January 14, 2003

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, IV, and V, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ., joined, and an opinion with respect to Part III, in which REHNQUIST, C. J., and THOMAS, J., joined. O'CONNOR, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 116. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined, *post*, p. 118.

*Robert Brett Dunham* argued the cause for petitioner. With him on the briefs were *Anne L. Saunders* and *John T. Adams.*

*Iva C. Dougherty* argued the cause for respondent. With her on the brief were *Mark C. Baldwin* and *Alisa R. Hobart.*

*Sri Srinivasan* argued the cause *pro hac vice* for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Assistant Attorney General Chertoff, Deputy Solicitor General Dreeben,* and *Robert J. Erickson.*

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, IV, and V, and an opinion with respect to Part III, in which THE CHIEF JUSTICE and JUSTICE THOMAS join.*

In this case, we consider once again the applicability of the Fifth Amendment's Double Jeopardy Clause in the context of capital-sentencing proceedings.

## I

On Sunday evening, April 12, 1987, petitioner David Allen Sattazahn and his accomplice, Jeffrey Hammer, hid in a wooded area waiting to rob Richard Boyer, manager of the Heidelberg Family Restaurant. Sattazahn carried a .22-caliber Ruger semiautomatic pistol and Hammer a .41-caliber revolver. They accosted Boyer in the restaurant's parking lot at closing time. With guns drawn, they demanded the bank deposit bag containing the day's receipts. Boyer threw the bag toward the roof of the restaurant. Petitioner commanded Boyer to retrieve the bag, but instead of complying Boyer tried to run away. Both petitioner and Hammer fired shots, and Boyer fell dead. The two men then grabbed the deposit bag and fled.

The Commonwealth of Pennsylvania prosecuted petitioner and sought the death penalty. On May 10, 1991, a jury returned a conviction of first-, second-, and third-degree murder, and various other charges. In accordance with Penn-

---

*JUSTICE KENNEDY joins all but Part III of this opinion.

sylvania law the proceeding then moved into a penalty phase. See Pa. Stat. Ann., Tit. 18, § 1102(a)(1) (Purdon 1998); Pa. Stat. Ann., Tit. 42, § 9711(a)(1) (Purdon Supp. 2002). The Commonwealth presented evidence of one statutory aggravating circumstance: commission of the murder while in the perpetration of a felony. See § 9711(d)(6). Petitioner presented as mitigating circumstances his lack of a significant history of prior criminal convictions and his age at the time of the crime. See §§ 9711(e)(1), (4). 563 Pa. 533, 539, 763 A. 2d 359, 362 (2000).

Pennsylvania law provides that, in the penalty phase of capital proceedings:

> "(iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.

> "(v) the court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment." § 9711(c) (Purdon Supp. 2002).

After both sides presented their evidence, the jury deliberated for some 3½ hours, App. 23, after which it returned a note signed by the foreman which read: "We, the jury are hopelessly deadlocked at 9-3 for life imprisonment. Each one is deeply entrenched in their [sic] position. We do not expect anyone to change his or her position." Id., at 25. Petitioner then moved "under 9711(c), subparagraph 1, subparagraph Roman Numeral 5, that the jury be discharged and that [the court] enter a sentence of life imprisonment." Id., at 22. The trial judge, in accordance with Pennsylvania

law, discharged the jury as hung, and indicated that he would enter the required life sentence, *id.*, at 23–24, which he later did, *id.*, at 30–33.

Petitioner appealed to the Pennsylvania Superior Court. That court concluded that the trial judge had erred in instructing the jury in connection with various offenses with which petitioner was charged, including first-degree murder. It accordingly reversed petitioner's first-degree murder conviction and remanded for a new trial. *Commonwealth* v. *Sattazahn*, 428 Pa. Super. 413, 631 A. 2d 597 (1993).

On remand, Pennsylvania filed a notice of intent to seek the death penalty. In addition to the aggravating circumstance alleged at the first sentencing hearing, the notice also alleged a second aggravating circumstance, petitioner's significant history of felony convictions involving the use or threat of violence to the person. (This was based on guilty pleas to a murder, multiple burglaries, and a robbery entered after the first trial.) Petitioner moved to prevent Pennsylvania from seeking the death penalty and from adding the second aggravating circumstance on retrial. The trial court denied the motion, the Superior Court affirmed the denial, App. 73, and the Pennsylvania Supreme Court declined to review the ruling, *Commonwealth* v. *Sattazahn*, 547 Pa. 742, 690 A. 2d 1162 (1997). At the second trial, the jury again convicted petitioner of first-degree murder, but this time imposed a sentence of death.

On direct appeal, the Pennsylvania Supreme Court affirmed both the verdict of guilt and the sentence of death on retrial. 563 Pa., at 551, 763 A. 2d, at 369. Relying on its earlier decision in *Commonwealth* v. *Martorano*, 535 Pa. 178, 634 A. 2d 1063 (1993), the court concluded that neither the Double Jeopardy Clause nor the Due Process Clause barred Pennsylvania from seeking the death penalty at petitioner's retrial. 563 Pa., at 545–551, 763 A. 2d, at 366–369. We granted certiorari. 535 U. S. 926 (2002).

## II

### A

The Double Jeopardy Clause of the Fifth Amendment commands that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." Under this Clause, once a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense. *North Carolina* v. *Pearce*, 395 U. S. 711, 717 (1969). Where, as here, a defendant is convicted of murder and sentenced to life imprisonment, but appeals the conviction and succeeds in having it set aside, we have held that jeopardy has not terminated, so that the life sentence imposed in connection with the initial conviction raises no double-jeopardy bar to a death sentence on retrial. *Stroud* v. *United States*, 251 U. S. 15 (1919).

In *Stroud*, the only offense at issue was that of murder, and the sentence was imposed by a judge who did not have to make any further findings in order to impose the death penalty. *Id.*, at 18. In *Bullington* v. *Missouri*, 451 U. S. 430 (1981), however, we held that the Double Jeopardy Clause does apply to capital-sentencing proceedings where such proceedings "have the hallmarks of the trial on guilt or innocence." *Id.*, at 439. We identified several aspects of Missouri's sentencing proceeding that resembled a trial, including the requirement that the prosecution prove certain statutorily defined facts beyond a reasonable doubt to support a sentence of death. *Id.*, at 438. Such a procedure, we explained, "*explicitly requires* the jury to determine whether the prosecution has 'proved its case.'" *Id.*, at 444. Since, we concluded, a sentence of life imprisonment signifies that "'the jury has already acquitted the defendant of whatever was necessary to impose the death sentence,'" the Double Jeopardy Clause bars a State from seeking the death penalty on retrial. *Id.*, at 445 (quoting *State ex rel. Westfall*

v. *Mason,* 594 S. W. 2d 908, 922 (Mo. 1980) (Bardgett, C. J., dissenting)).

We were, however, careful to emphasize that it is not the mere imposition of a life sentence that raises a double-jeopardy bar. We discussed *Stroud,* a case in which a defendant who had been convicted of first-degree murder and sentenced to life imprisonment obtained a reversal of his conviction and a new trial when the Solicitor General confessed error. In *Stroud,* the Court unanimously held that the Double Jeopardy Clause did not bar imposition of the death penalty at the new trial. 251 U. S., at 17–18. What distinguished *Bullington* from *Stroud,* we said, was the fact that in *Stroud* "there was no separate sentencing proceeding at which the prosecution was required to prove—beyond a reasonable doubt or otherwise—additional facts in order to justify the particular sentence." *Bullington,* 451 U. S., at 439. We made clear that an "acquittal" at a trial-like sentencing phase, rather than the mere imposition of a life sentence, is required to give rise to double-jeopardy protections. *Id.,* at 446.

Later decisions refined *Bullington's* rationale. In *Arizona* v. *Rumsey,* 467 U. S. 203 (1984), the State had argued in the sentencing phase, based on evidence presented during the guilt phase, that three statutory aggravating circumstances were present. The trial court, however, found that no statutory aggravator existed, and accordingly entered judgment in the accused's favor on the issue of death. On the State's cross-appeal, the Supreme Court of Arizona concluded that the trial court had erred in its interpretation of one of the statutory aggravating circumstances, and remanded for a new sentencing proceeding, which produced a sentence of death. *Id.,* at 205–206. In setting that sentence aside, we explained that "[t]he double jeopardy principle relevant to [Rumsey's] case is the same as that invoked in *Bullington:* an acquittal on the merits by the sole deci-

sionmaker in the proceeding is final and bars retrial on the same charge." *Id.,* at 211.

> "The trial court entered findings denying the existence of each of the seven statutory aggravating circumstances, and as required by state law, the court then entered judgment in respondent's favor on the issue of death. That judgment, *based on findings sufficient to establish legal entitlement to the life sentence,* amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty." *Ibid.* (emphasis added).

*Rumsey* thus reaffirmed that the relevant inquiry for double-jeopardy purposes was not whether the defendant received a life sentence the first time around, but rather whether a first life sentence was an "acquittal" based on findings sufficient to establish legal entitlement to the life sentence—*i. e.,* findings that the government failed to prove one or more aggravating circumstances beyond a reasonable doubt.

A later case in the line, *Poland* v. *Arizona,* 476 U. S. 147 (1986), involved two defendants convicted of first-degree murder and sentenced to death. On appeal the Arizona Supreme Court set aside the convictions (because of jury consideration of nonrecord evidence) and further found that there was insufficient evidence to support the one aggravating circumstance found by the trial court. It concluded, however, that there *was* sufficient evidence to support a *different* aggravating circumstance, which the trial court had thought not proved. The court remanded for retrial; the defendants were again convicted of first-degree murder, and a sentence of death was again imposed. *Id.,* at 149–150. We decided that in those circumstances, the Double Jeopardy Clause was *not* implicated. We distinguished *Bullington* and *Rumsey* on the ground that in *Poland,* unlike in those cases, neither the judge nor the jury had "acquitted" the de-

fendant in his first capital-sentencing proceeding by entering findings sufficient to establish legal entitlement to the life sentence. 476 U. S., at 155–157.

## B

Normally, "a retrial following a 'hung jury' does not violate the Double Jeopardy Clause." *Richardson* v. *United States,* 468 U. S. 317, 324 (1984). Petitioner contends, however, that given the unique treatment afforded capital-sentencing proceedings under *Bullington,* double-jeopardy protections were triggered when the jury deadlocked at his first sentencing proceeding and the court prescribed a sentence of life imprisonment pursuant to Pennsylvania law.

We disagree. Under the *Bullington* line of cases just discussed, the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an "acquittal." Petitioner here cannot establish that the jury or the court "acquitted" him during his first capital-sentencing proceeding. As to the jury: The verdict form returned by the foreman stated that the jury deadlocked 9-to-3 on whether to impose the death penalty; it made no findings with respect to the alleged aggravating circumstance. That result—or more appropriately, that non-result—cannot fairly be called an acquittal "based on findings sufficient to establish legal entitlement to the life sentence." *Rumsey, supra,* at 211.

The entry of a life sentence by the judge was not "acquittal," either. As the Pennsylvania Supreme Court explained:

> "'Under Pennsylvania's sentencing scheme, the judge has no discretion to fashion sentence once he finds that the jury is deadlocked. The statute directs him to enter a life sentence. 42 Pa. C. S. § 9711(c)(1)(v) (. . . if . . . further deliberation will not result in a unanimous agreement as to the sentence, . . . the court *shall* sentence the defendant to life imprisonment.) (emphasis added). The judge makes no findings and resolves no

factual matter. Since judgment is not based on findings which resolve some factual matter, it is not sufficient to establish legal entitlement to a life sentence. A default judgment does not trigger a double jeopardy bar to the death penalty upon retrial.'" 563 Pa., at 548, 763 A. 2d, at 367 (quoting *Martorano,* 535 Pa., at 194, 634 A. 2d, at 1070).

It could be argued, perhaps, that the statutorily required entry of a life sentence creates an "entitlement" even without an "acquittal," because that is what the Pennsylvania Legislature intended—*i. e.,* it intended that the life sentence should survive vacation of the underlying conviction. The Pennsylvania Supreme Court, however, did not find such intent in the statute—and there was eminently good cause not to do so. A State's simple interest in closure might make it willing to accept the default penalty of life imprisonment when the conviction is affirmed and the case is, except for that issue, at an end—but unwilling to do so when the case must be retried anyway. And its interest in conservation of resources might make it willing to leave the sentencing issue unresolved (and the default life sentence in place) where the cost of resolving it is the empaneling of a new jury and, in all likelihood, a repetition of much of the guilt phase of the first trial—though it is eager to attend to that unfinished business if there is to be a new jury and a new trial anyway.

### III

### A

When *Bullington, Rumsey,* and *Poland* were decided, capital-sentencing proceedings were understood to be just that: *sentencing proceedings.* Whatever "hallmarks of [a] trial" they might have borne, *Bullington,* 451 U. S., at 439, they differed from trials in a respect crucial for purposes of the Double Jeopardy Clause: They dealt only with the *sentence* to be imposed for the "offence" of capital murder. Thus, in its search for a rationale to support *Bullington* and

its "progeny," the Court continually tripped over the text of the Double Jeopardy Clause.

Recent developments, however, have illuminated this part of our jurisprudence. Our decision in *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), clarified what constitutes an "element" of an offense for purposes of the Sixth Amendment's jury-trial guarantee. Put simply, if the existence of any fact (other than a prior conviction) increases the maximum punishment that may be imposed on a defendant, that fact—no matter how the State labels it—constitutes an element, and must be found by a jury beyond a reasonable doubt. *Id.*, at 482–484, 490.

Just last Term we recognized the import of *Apprendi* in the context of capital-sentencing proceedings. In *Ring* v. *Arizona*, 536 U. S. 584 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a *greater offense.*'" *Id.*, at 609 (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death. Accordingly, we held that the Sixth Amendment requires that a jury, and not a judge, find the existence of any aggravating circumstances, and that they be found, not by a mere preponderance of the evidence, but beyond a reasonable doubt. *Id.*, at 608–609.

We can think of no principled reason to distinguish, in this context, between what constitutes an offense for purposes of the Sixth Amendment's jury-trial guarantee and what constitutes an "offence" for purposes of the Fifth Amendment's Double Jeopardy Clause. Cf. *Monge* v. *California*, 524 U. S. 721, 738 (1998) (SCALIA, J., dissenting) ("The fundamental distinction between facts that are *elements* of a criminal

offense and facts that go only to the *sentence*" not only "delimits the boundaries of . . . important constitutional rights, like the Sixth Amendment right to trial by jury," but also "provides the foundation for our entire double jeopardy jurisprudence"). In the post-*Ring* world, the Double Jeopardy Clause can, and must, apply to some capital-sentencing proceedings consistent with the text of the Fifth Amendment. If a jury unanimously concludes that a State has failed to meet its burden of proving the existence of one or more aggravating circumstances, double-jeopardy protections attach to that "acquittal" on the offense of "murder plus aggravating circumstance(s)." Thus, *Rumsey* was correct to focus on whether a factfinder had made findings that constituted an "acquittal" of the aggravating circumstances; but the reason that issue was central is not that a capital-sentencing proceeding is "comparable to a trial," 467 U. S., at 209 (citing *Bullington, supra,* at 438), but rather that "murder plus one or more aggravating circumstances" is a separate offense from "murder" *simpliciter.*

## B

For purposes of the Double Jeopardy Clause, then, "first-degree murder" under Pennsylvania law—the offense of which petitioner was convicted during the guilt phase of his proceedings—is properly understood to be a lesser included offense of "first-degree murder plus aggravating circumstance(s)." See *Ring, supra,* at 609. Thus, if petitioner's first sentencing jury had unanimously concluded that Pennsylvania failed to prove any aggravating circumstances, that conclusion would operate as an "acquittal" of the greater offense—which would bar Pennsylvania from retrying petitioner on that greater offense (and thus, from seeking the death penalty) on retrial. Cf. *Rumsey, supra,* at 211.

But that is not what happened. Petitioner was convicted in the guilt phase of his first trial of the lesser offense of first-degree murder. During the sentencing phase, the jury

deliberated without reaching a decision on death or life, and without making any findings regarding aggravating or mitigating circumstances. After 3½ hours the judge dismissed the jury as hung and entered a life sentence in accordance with Pennsylvania law. As explained, *supra*, at 109–110, neither judge nor jury "acquitted" petitioner of the greater offense of "first-degree murder plus aggravating circumstance(s)." Thus, when petitioner appealed and succeeded in invalidating his conviction of the lesser offense, there was no double-jeopardy bar to Pennsylvania's retrying petitioner on both the lesser and the greater offense; his "jeopardy" never terminated with respect to either. Cf. *Green* v. *United States*, 355 U. S. 184, 189 (1957) (citing *United States* v. *Ball*, 163 U. S. 662 (1896)); *Selvester* v. *United States*, 170 U. S. 262, 269 (1898).

## IV

The dissent reads the Court's decision in *United States* v. *Scott*, 437 U. S. 82 (1978), as supporting the proposition that where, as here, a defendant's "case was fully tried and the court, on its own motion, entered a final judgment—a life sentence—terminating the trial proceedings," *post*, at 126 (opinion of GINSBURG, J.), the Double Jeopardy Clause bars retrial. There are several problems with this reasoning.

First, it is an understatement to say that "*Scott* . . . did not home in on a case like [petitioner's]," *post*, at 123. The statement upon which the dissent relies—that double jeopardy "may" attach when the "trial judge terminates the proceedings favorably to the defendant on a basis not related to factual guilt or innocence," 437 U. S., at 92, at least where the defendant "had either been found not guilty *or . . . had at least insisted on having the issue of guilt submitted to the first trier of fact*," *id.*, at 96 (emphasis added)—was nothing more than dictum, and a tentative one ("may") at that. It would be a thin reed on which to rest a hitherto unknown constitutional prohibition of the entirely rational course of

making a hung jury's failure to convict provisionally final, subject to change if the case must be retried anyway.

Second, the dictum in *Scott* does not even embrace the present case. The petitioner here did not "insist" upon a merits determination, but to the contrary asked that the jury be dismissed as hung. As the dissent recognizes, when the jury announced that it was deadlocked, petitioner "move[d] 'that the jury be discharged' and that a life sentence be entered under [Pa. Stat. Ann., Tit. 42,] § 9711(c)(1)(v)." *Post,* at 125, n. 5. It is no response to say that "[t]he judge did not grant [the] motion," but instead made a legal determination whether petitioner was entitled to the judgment he sought. *Ibid.* Surely double-jeopardy protections cannot hinge on whether a trial court characterizes its action as self-initiated or in response to motion. Cf. *Scott, supra,* at 96. What actually happened in this case is the same as what happened in *Scott,* where we *denied* double-jeopardy protection: (1) the defendant moved for entry of a judgment in his favor on procedural grounds (there, delay in indictment; here, a hung jury); (2) the judge measured facts (there, the length of delay; here, the likelihood of the jury's producing a verdict) against a legal standard to determine whether such relief was appropriate; and (3) concluding that it was, granted the relief.

Nor, in these circumstances, does the prospect of a second capital-sentencing proceeding implicate any of the "perils against which the Double Jeopardy Clause seeks to protect." *Post,* at 124 (GINSBURG, J., dissenting). The dissent stresses that a defendant in such circumstances is "subject to the 'ordeal' of a second full-blown life or death trial," which " 'compel[s] [him] to live in a continuing state of anxiety and insecurity.' " *Ibid.* (quoting *Green* v. *United States, supra,* at 187); see also *post,* at 127. But as even the dissent must admit, *post,* at 125, we have not found this concern determinative of double jeopardy in all circumstances. And it should not be so here. This case hardly presents the specter of "an

all-powerful state relentlessly pursuing a defendant who had either been found not guilty or who had at least insisted on having the issue of guilt submitted to the first trier of fact." *Scott, supra,* at 96. Instead, we see here a State which, for any number of perfectly understandable reasons, *supra,* at 110, has quite reasonably agreed to accept the default penalty of life imprisonment when the conviction is affirmed and the case is, except for that issue, at an end—but to pursue its not-yet-vindicated interest in " 'one complete opportunity to convict those who have violated its laws' " where the case must be retried anyway, *post,* at 124 (quoting *Arizona* v. *Washington,* 434 U. S. 497, 509 (1978)).

## V

In addition to his double-jeopardy claim, petitioner raises a freestanding claim alleging deprivation of due process in violation of the Fourteenth Amendment. He contends that, regardless of whether the imposition of the death sentence at the second trial violated the Double Jeopardy Clause, it unfairly deprived him of his "life" and "liberty" interests in the life sentence resulting from his first sentencing proceeding. He frames the argument in these terms:

> "Pennsylvania created a constitutionally protected life and liberty interest in the finality of the life judgment statutorily mandated as a result of a [deadlocked] jury. That right vested when the court found the jury deadlocked and imposed a mandatory life sentence. Subjecting [p]etitioner to a capital resentencing once that right has vested violated [D]ue [P]rocess." Reply Brief for Petitioner 18–19.

We think not. Section 1 of the Fourteenth Amendment commands that "[n]o State shall . . . deprive any person of life, liberty, or property, *without due process of law* . . . ." (Emphasis added.) Nothing indicates that any "life" or "liberty" interest that Pennsylvania law may have given peti-

tioner in the life sentence imposed after his first capital-sentencing proceeding was somehow immutable. And he was "deprived" of any such interest only by operation of the "process" he invoked to invalidate the underlying first-degree murder conviction on which it was based.

At bottom, petitioner's due-process claim is nothing more than his double-jeopardy claim in different clothing. As we have said:

> "The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order." *Medina* v. *California,* 505 U. S. 437, 443 (1992).

We decline petitioner's invitation to hold that the Due Process Clause provides greater double-jeopardy protection than does the Double Jeopardy Clause.

\* \* \*

The Pennsylvania Supreme Court correctly concluded that neither the Fifth Amendment's Double Jeopardy Clause nor the Fourteenth Amendment's Due Process Clause barred Pennsylvania from seeking the death penalty against petitioner on retrial. The judgment of that court is, therefore,

*Affirmed.*

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

I join Parts I, II, IV, and V of the Court's opinion in this case. I do not join Part III, which would further extend the reach of *Apprendi* v. *New Jersey,* 530 U. S. 466 (2000), because I continue to believe that case was wrongly decided. See *id.,* at 523–553 (O'CONNOR, J., dissenting); see also *Ring*

v. *Arizona,* 536 U. S. 584, 619–620 (2002) (O'CONNOR, J., dissenting). It remains my view that *"Apprendi's* rule that any fact that increases the maximum penalty must be treated as an element of the crime is not required by the Constitution, by history, or by our prior cases." *Id.,* at 619.

I would resolve petitioner's double jeopardy claim on the sole ground that under *Bullington* v. *Missouri,* 451 U. S. 430 (1981), and its progeny a life sentence imposed by operation of law after a capital sentencing jury deadlocks and fails to reach a unanimous verdict is not an "acquittal on the merits" barring retrial. Because death penalty sentencing proceedings bear the hallmarks of a trial, we held in *Arizona* v. *Rumsey,* 467 U. S. 203, 211 (1984), that "an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge." A defendant is "acquitted" of the death penalty for purposes of double jeopardy when the sentencer "decide[s] that the prosecution has not proved its case that the death penalty is appropriate." *Poland* v. *Arizona,* 476 U. S. 147, 155 (1986) (emphasis deleted and internal quotation marks omitted). In the absence of a death penalty acquittal, the "clean slate" rule recognized in *North Carolina* v. *Pearce,* 395 U. S. 711, 719–721 (1969), applies and no double jeopardy bar arises.

When, as in this case, the jury deadlocks in the penalty phase of a capital trial, it does not "decide" that the prosecution has failed to prove its case for the death penalty. Rather, the jury makes no decision at all. Petitioner's jury did not *"agre[e]* . . . that the prosecution ha[d] not proved its case." *Bullington, supra,* at 443 (emphasis added). It did not make any findings about the existence of the aggravating or mitigating circumstances. See *Rumsey, supra,* at 211 (where the trial judge "entered findings denying the existence of each of the seven statutory aggravating circumstances," the resulting "judgment, based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any

retrial of the appropriateness of the death penalty"). In short, the jury did not "acquit" petitioner of the death penalty under *Bullington* and *Rumsey.*

That Pennsylvania law mandates a life sentence when a capital sentencing jury deadlocks does not, for the reasons given by the Court, *ante,* at 110, transform that life sentence into a death penalty acquittal. Because petitioner was neither acquitted nor convicted of the death penalty in his first trial, the Double Jeopardy Clause was not offended by a retrial to determine whether death was the appropriate punishment for his offenses. There is no need to say more.

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

This case concerns the events that "terminat[e] jeopardy" for purposes of the Double Jeopardy Clause. *Richardson* v. *United States,* 468 U. S. 317, 325 (1984). The specific controversy before the Court involves the entry of final judgment, as mandated by state law, after a jury deadlock. The question presented is whether a final judgment so entered qualifies as a jeopardy-terminating event. The Court concludes it does not. I would hold that it does.

When a Pennsylvania capital jury deadlocks at the sentencing stage of a proceeding, state law requires the trial court to enter a judgment imposing a life sentence. See Pa. Stat. Ann., Tit. 42, § 9711(c)(1)(v) (Purdon Supp. 2002). Ordinarily, a judgment thus imposed is final. The government may neither appeal the sentence nor retry the sentencing question before a second jury. See Brief for Petitioner 7; Tr. of Oral Arg. 26. The sentencing question can be retried—if retrial is not barred by the Double Jeopardy Clause—only if the defendant successfully appeals the underlying conviction and is convicted again on retrial.[1]

_____

[1] When a typical criminal jury is unable to agree on a verdict, in contrast, the judge declares a mistrial and the prosecutor has the immediate right to reprosecute the counts on which the jury hung. See, *e. g., Rich-*

The Court today holds that the state-mandated entry of a life sentence after a jury deadlock, measured against the Double Jeopardy Clause, does not block retrial of the life or death question. The Court so rules because the life sentence, although final under state law, see *id.*, at 25–26, is not the equivalent of "an acquittal on the merits," *ante*, at 107–108 (quoting *Arizona* v. *Rumsey*, 467 U. S. 203, 211 (1984)). Our double jeopardy case law does indeed "attac[h] particular significance to an acquittal," *United States* v. *Scott*, 437 U. S. 82, 91 (1978); that jurisprudence accords "absolute finality to a jury's *verdict* of acquittal[,] no matter how erroneous its decision," *Burks* v. *United States*, 437 U. S. 1, 16 (1978). And, as the Court stresses, the hung jury in Sattazahn's sentencing proceeding did not "acqui[t]" him "on the merits." *Ante*, at 107 (internal quotation marks omitted). But these two undebatable points are not inevitably dispositive of this case, for our decisions recognize that jeopardy can terminate in circumstances other than an acquittal. Cf. *Richardson*, 468 U. S., at 325 ("[T]he Double Jeopardy Clause by its terms applies only if there has been some event, *such as* an acquittal, which terminates the original jeopardy." (Emphasis added.)).

In no prior case have we decided whether jeopardy is terminated by the entry of a state-mandated sentence when the jury has deadlocked on the sentencing question. As I see it, the question is genuinely debatable, with tenable argument supporting each side. Comprehending our double jeopardy decisions in light of the underlying purposes of the Double Jeopardy Clause, I conclude that jeopardy does terminate in such circumstances. I would hold, as herein explained, that once the trial court entered a final judgment of life for Sattazahn, the Double Jeopardy Clause barred Pennsylvania from seeking the death penalty a second time.

---

*ardson* v. *United States*, 468 U. S. 317, 318, 325 (1984); *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564, 570 (1977).

## I

The standard way for a defendant to secure a final judgment in her favor is to gain an acquittal.[2] This case involves the atypical situation in which a defendant prevails by final judgment *without* an acquittal. Unusual as the situation is, our double jeopardy jurisprudence recognizes its existence. In *Scott*, the Court stated that the "primary purpose" of the Double Jeopardy Clause is to "protect the integrity" of final determinations of guilt or innocence. 437 U. S., at 92. We acknowledged, however, that "this Court has also developed a body of law guarding the separate but related interest of a defendant in avoiding multiple prosecutions even where no final determination of guilt or innocence has been made." *Ibid.* "Such interests," we observed, "may be involved in two different situations: the first, in which the trial judge declares a mistrial; the second, in which the trial judge terminates the proceedings favorably to the defendant on a basis not related to factual guilt or innocence." *Ibid.*

The first category—mistrials—is instructive, although the case at hand does not fit within that category. In deciding whether reprosecution is permissible after a mistrial, "this Court has balanced the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him against the public interest in insuring

---

[2] The Court has many times said that the Double Jeopardy Clause protects the integrity of "final judgments.". See, *e. g.*, *Crist* v. *Bretz*, 437 U. S. 28, 33 (1978) ("A primary purpose" served by the Double Jeopardy Clause is "akin to that served by the doctrines of *res judicata* and collateral estoppel—to preserve the finality of judgments."); *United States* v. *Scott*, 437 U. S. 82, 92 (1978) ("the primary purpose of the Double Jeopardy Clause was to protect the integrity of a final judgment"). In such declarations, the Court appears to have used "final judgment" interchangeably with "acquittal." See *Crist*, 437 U. S., at 33 (referring to the English common-law rule that "a defendant has been put in jeopardy only when there has been a conviction or an acquittal—after a complete trial"); *Scott*, 437 U. S., at 92 (equating the term "final judgment" with a "final determination of guilt or innocence").

that justice is meted out to offenders." *Ibid.* (internal quotation marks and citation omitted). Weighing these interests, we have decided that mistrials declared on the motion of the prosecution or *sua sponte* by the court terminate jeopardy unless stopping the proceedings is required by "manifest necessity." *Id.*, at 93–94; see, *e. g.*, *Downum* v. *United States*, 372 U. S. 734, 737–738 (1963). A hung jury, the Court has long recognized, meets the "manifest necessity" criterion, *i. e.*, it justifies a trial court's declaration of a mistrial and the defendant's subsequent reprosecution. *Arizona* v. *Washington*, 434 U. S. 497, 509 (1978). Retrial is also permissible where "a *defendant* successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial," *Scott*, 437 U. S., at 93, unless the motion is intentionally provoked by the government's actions, *id.*, at 94. Ordinarily, "[s]uch a motion by the defendant is deemed to be a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact." *Id.*, at 93.

The second category described in *Scott*—"termination of [a] trial in [a defendant's] favor before any determination of factual guilt or innocence," *id.*, at 94—is distinguished from the first based on the quality of finality a termination order imports. "When a trial court declares a mistrial, it all but invariably contemplates that the prosecutor will be permitted to proceed anew notwithstanding the defendant's plea of double jeopardy." *Id.*, at 92. When a motion to terminate is granted, in contrast, the trial court "obviously contemplates that the proceedings will terminate then and there in favor of the defendant." *Id.*, at 94. In *Scott*, for example, the trial court granted the defendant's motion to dismiss one count of the indictment, prior to its submission to the jury, on the ground of preindictment delay. If the prosecution had wanted to "reinstate the proceedings in the face of such a ruling," it could not simply have refiled the indictment; in-

stead, it would have had to "seek reversal of the decision of the trial court" by pursuing an appeal. *Ibid.*[3]

Sattazahn's case falls within *Scott's* second category. After the jury deadlocked at the sentencing stage, no mistrial was declared, for Pennsylvania law provided that the trial proceedings would terminate "then and there" in Sattazahn's favor. The government could not simply retry the sentencing issue at will. The hung jury in Sattazahn's case did not "mak[e] . . . completion" of the first proceeding "impossible," *Wade* v. *Hunter,* 336 U. S. 684, 689 (1949); instead, Pennsylvania law *required* the judge to bring that proceeding to a conclusion by entering a final judgment imposing a life sentence, see Pa. Stat. Ann., Tit. 42, § 9711(c)(1)(v) (Purdon Supp. 2002).

Double jeopardy law with respect to *Scott's* second category is relatively undeveloped. As observed at the outset, see *supra,* at 119, we have never before decided whether jeopardy terminates upon the entry of a state-mandated final judgment favorable to a defendant *after* a jury deadlocks. We have, however, addressed the termination of a trial *prior* to submission of the case to the jury. *Scott* was such a case and, as the Court underscores, *ante,* at 114, that decision denied double jeopardy protection. In allowing a second prosecution in *Scott,* however, the Court stressed that the defendant "deliberately ch[ose] to seek termination of the proceedings against him on a basis unrelated to factual guilt or innocence," *i. e.,* the prosecution's preindictment delay, 437 U. S., at 98–99: Scott "successfully undertook to persuade the trial court not to submit the issue of guilt or innocence to the jury . . . empaneled to try him," *id.,* at 99. Although

---

[3] When this Court has considered dismissals of indictments that contemplate the possibility of immediate reprosecution without an appeal, it has analyzed them as mistrials. See *Lee* v. *United States,* 432 U. S. 23, 30 (1977) (dismissal based on insufficient indictment treated as mistrial for double jeopardy purposes because Government could simply file new indictment without appealing dismissal).

holding that the Double Jeopardy Clause "does not relieve a defendant from the consequences of his voluntary choice," *ibid.*, the Court reiterated the underlying purpose of the Clause: to prevent the State from making "repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity," *id.*, at 95 (quoting *Green* v. *United States*, 355 U. S. 184, 187 (1957)).

The ruling in *Scott* placing the defendant in that case outside the zone of double jeopardy protection, in sum, was tied to the absence of a completed first trial episode and to the defendant's choice to abort the initial trial proceedings. "[T]he Government," we explained, "was quite willing to continue with its production of evidence . . . , but the defendant elected to seek termination of the trial on grounds unrelated to guilt or innocence." 437 U. S., at 96. "This is scarcely a picture of an all-powerful state relentlessly pursuing a defendant who had either been found not guilty or who had at least insisted on having the issue of guilt submitted to the first trier of fact." *Ibid.*

## II

*Scott*, it is true, did not home in on a case like Sattazahn's. The Court's reasoning, nevertheless, lends credence to the view that a trial-terminating judgment for life, not prompted by a procedural move on the defendant's part, creates a legal entitlement protected by the Double Jeopardy Clause. Cf. *Rumsey*, 467 U. S., at 211 (judgment based on factual findings sufficient to establish "legal entitlement" to a life sentence bars retrial). *Scott* recognized that defendants have a double jeopardy interest in avoiding multiple prosecutions even when there has been no determination of guilt or innocence, and that this interest is implicated by preverdict judgments terminating trials. 437 U. S., at 92. The interest in avoiding a renewed prosecution following a final judg-

ment is surely engaged here. Sattazahn's life sentence had significantly greater finality than the dismissal for preindictment delay in *Scott*, for under Pennsylvania law, as noted earlier, see *supra*, at 118, the government could not have sought to retry the sentencing question even through an appeal.

Moreover—and discrete from the Court's analysis in *Scott*—the perils against which the Double Jeopardy Clause seeks to protect are plainly implicated by the prospect of a second capital sentencing proceeding. A determination that defendants in Sattazahn's position are subject to the "ordeal" of a second full-blown life or death trial "compel[s] [them] to live in a continuing state of anxiety and insecurity." *Green*, 355 U. S., at 187.[4]

Despite the attendant generation of anxiety and insecurity, we have allowed retrial after hung jury mistrials in order to give the State "one complete opportunity to convict those who have violated its laws." *Washington*, 434 U. S., at 509; see *Wade*, 336 U. S., at 689 ("a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments"). But here, the Commonwealth has already had such an opportunity: The prosecution presented its evidence to the jury, and after the jury deadlocked, final judgment was entered at the direction of the state legislature itself. This was not an instance in which "the Government was quite willing to continue with its production of evidence," but was thwarted by a defense-proffered motion. *Scott*, 437 U. S., at 96.

---

[4] The Court identifies policy reasons why a legislature might prefer to provide for the entry of a judgment that could be reopened should the defendant mount a successful appeal. See *ante*, at 110, 115. It does not automatically follow, however, that such a provisional judgment would be compatible with the Double Jeopardy Clause. Cf. *infra*, at 127 (urging that the prospect of a second death penalty proceeding heightens double jeopardy concerns).

We also sanctioned retrial in *Scott*, even though that case involved a final adjudication. But there, the defendant voluntarily avoided subjecting himself to a determination of guilt or innocence in the first proceeding; he did so by successfully moving, prior to submission of the case to the jury, for dismissal of the count in question because of preindictment delay. *Ibid.*; see *Green*, 355 U. S., at 188 (suggesting that double jeopardy protection does not apply if defendant consents to dismissal of his first jury). That was not the situation here: Unlike Scott, Sattazahn did not successfully avoid having the question of his guilt or innocence submitted to the first jury. The "issue of guilt" in his case indeed was "submitted to the first trier of fact." *Scott*, 437 U. S., at 96. Sattazahn was thus "forced to run the gantlet once" on death. *Green*, 355 U. S., at 190. Nor did Sattazahn himself bring about termination of his first trial.[5] Once the jury deadlocked, state law directly mandated that the trial end. In

---

[5] The governing statute provides that "the court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment." Pa. Stat. Ann., Tit. 42, § 9711(c)(1)(v) (Purdon Supp. 2002). In Sattazahn's case, after the jury had deliberated for about 3½ hours, the judge announced that he had "received a communication from the foreperson indicating this jury is hopelessly deadlocked." App. 22. He then stated: "I will bring the jury down and inquire of the foreperson and the jury whether or not any further deliberations would be productive." *Ibid.* Only at that point did Sattazahn move "that the jury be discharged" and that a life sentence be entered under § 9711(c)(1)(v). *Ibid.* The judge did not grant Sattazahn's motion. Instead, he conducted an inquiry to determine whether the jury was "hopelessly deadlocked"; he then found that it was, discharged the jury, and announced that "by virtue of the law" he would enter a life sentence. *Id.*, at 23–24. The judge, at that stage, never referred back to Sattazahn's motion. As I read this record, the judge's decision to conduct an inquiry, discharge the jury, and enter a life sentence was prompted not by a defensive motion, but simply by the jury's announcement that it was deadlocked, just as the statute instructs.

short, the reasons we thought double jeopardy protection did not attach in *Scott* are absent here.[6]

I recognize that this is a novel and close question: Sattazahn was not "acquitted" of the death penalty, but his case was fully tried and the court, on its own motion, entered a final judgment—a life sentence—terminating the trial proceedings. I would decide the double jeopardy issue in Sattazahn's favor, for the reasons herein stated, and giving weight to two ultimate considerations. First, the Court's holding confronts defendants with a perilous choice, one we have previously declined to impose in other circumstances. See *Green,* 355 U. S., at 193–194. Under the Court's decision, if a defendant sentenced to life after a jury deadlock chooses to appeal her underlying conviction, she faces the possibility of death if she is successful on appeal but convicted on retrial. If, on the other hand, the defendant loses her appeal, or chooses to forgo an appeal, the final judgment for life stands. In other words, a defendant in Sattazahn's position must relinquish either her right to file a potentially meritorious appeal, or her state-granted entitlement to avoid the death penalty.

---

[6] We have also held that the Double Jeopardy Clause does not bar imposition of a greater sentence on retrial if a defendant successfully appeals a conviction. See, *e. g., North Carolina* v. *Pearce,* 395 U. S. 711 (1969); *United States* v. *DiFrancesco,* 449 U. S. 117 (1980). "[T]he basic design of the double jeopardy provision . . . as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity," has "no significant application to the prosecution's . . . right to review a sentence." *Id.,* at 136. This Court has determined, however, that for purposes of the Double Jeopardy Clause, capital sentencing proceedings involving proof of one or more aggravating factors are to be treated as trials of separate *offenses,* not mere sentencing proceedings. See *ante,* at 106–109; *ante,* at 110–112 (opinion of SCALIA, J.); *Ring* v. *Arizona,* 536 U. S. 584 (2002); *Bullington* v. *Missouri,* 451 U. S. 430 (1981). Our decisions permitting resentencing after appeal of noncapital convictions thus do not address the question presented in this case.

We have previously declined to interpret the Double Jeopardy Clause in a manner that puts defendants in this bind. In *Green*, we rejected the argument that appealing a second-degree murder conviction prolonged jeopardy on a related first-degree murder charge. We noted that a ruling on this question in favor of the prosecutor would require defendants to "barter [their] constitutional protection against a second prosecution for an offense punishable by death as the price of a successful appeal from an erroneous conviction of another offense." *Id.*, at 193. "The law," we concluded, "should not . . . place [defendants] in such an incredible dilemma." *Ibid.* Although Sattazahn was required to barter a state-law entitlement to life against his right to appeal, rather than a constitutional protection, I nevertheless believe the considerations advanced in *Green* should inform our decision here.

Second, the punishment Sattazahn again faced on retrial was death, a penalty "unique in both its severity and its finality." *Monge* v. *California*, 524 U. S. 721, 732 (1998) (internal quotation marks omitted). These qualities heighten Sattazahn's double jeopardy interest in avoiding a second prosecution. The "hazards of [a second] trial and possible conviction," *Green*, 355 U. S., at 187, the "continuing state of anxiety and insecurity" to which retrial subjects a defendant, *ibid.*, and the "financial" as well as the "emotional burden" of a second trial, *Washington*, 434 U. S., at 503–504, are all exacerbated when the subsequent proceeding may terminate in death. Death, moreover, makes the "dilemma" a defendant faces when she decides whether to appeal all the more "incredible." *Green*, 355 U. S., at 193. As our elaboration in *Gregg* v. *Georgia*, 428 U. S. 153, 188 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), and later cases demonstrates, death is indeed a penalty "different" from all others.

For the reasons stated, I would hold that jeopardy terminated as to Sattazahn's sentence after the judge entered a final judgment for life. I would therefore reverse the judgment of the Supreme Court of Pennsylvania.