STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-269


STATE OF LOUISIANA

VERSUS

RICKY J. LANGLEY


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 10258-02
HONORABLE ALCIDE JOSEPH GRAY, DISTRICT JUDGE

**********

OSWALD A. DECUIR
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and Billie Colombaro
Woodard and Oswald A. Decuir, Judges.


Thibodeaux, C.J., concurs in part and
dissents in part and assigns reasons.

REVERSED AND REMANDED.


Rick Bryant, District Attorney
Cynthia S. Killingsworth, Assistant District Attorney
Sharon Darville Wilson, Assistant District Attorney
P.O. Box 3206
Lake Charles, LA 70602-3206
(337) 437-3400
Counsel for Appellee:
        State of Louisiana

**Carla S. Sigler, Assistant District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602**
**(337) 437-3400**
**Counsel for Appellee:**
**State of Louisiana**

**Clive Stafford Smith**
**Christine Lehmann**
**636 Baronne Street**
**New Orleans, LA 70113**
**(504) 558-9867**
**Counsel for Defendant/Appellant:**
**Ricky J. Langley**

**Ricky J. Langley**
**Louisiana State Penitentiary**
**Camp C - Jaguar 4**
**Angola, LA 70712**

**DECUIR, Judge.**

The Defendant, Ricky Langley, was indicted for the first degree murder of six-year-old Jeremy Guillory. He pled not guilty and not guilty by reason of insanity. After a jury trial, the Defendant was convicted of second degree murder and sentenced to life imprisonment. He now seeks review of his conviction, raising fifteen assignments of error. Because we find error in the conduct of the trial, we reverse and remand for a new trial.

## I. FACTS

The testimony in the record and the Defendant's detailed confession illustrate the following facts: On February 7, 1992, the Defendant was a boarder of the Lawrence family. The Lawrence home was located in a rural neighborhood in Calcasieu Parish. The victim, a neighbor, came to the Lawrence home to play, but the two Lawrence children were not home. The Defendant then invited the victim inside to wait for their return. While the victim was playing in the children's bedroom, the Defendant came into the room, grabbed him around the neck, and strangled him. Later, he hid the boy's body in a closet and covered him with blankets. There was also evidence that the Defendant, an admitted pedophile, sexually molested the boy either before or after his death.

When the victim's mother came to the house looking for her son, the Defendant helped her search for him in the surrounding area. He also placed a 911 call to report the missing child. Three days later, the local police learned the Defendant was a convicted child molester and a Georgia parole violator. An officer and two FBI agents located the Defendant at his place of employment where he was read his *Miranda* rights and arrested on the parole violation. After reading the Defendant his rights a second time, one of the agents informed the Defendant that he was a suspect in the disappearance of the victim. The Defendant then admitted killing the victim

and told the officers the body was in his bedroom closet. Upon arriving at the Lawrence home, the Defendant gave the officers a tour of the house and walked them through the events surrounding the murder, all of which was videotaped with his consent. He subsequently gave a second videotaped confession.

## II. PROCEDURAL HISTORY

The Defendant was originally convicted of first degree murder under La.R.S. 14:30 and sentenced to death. The Louisiana Supreme Court affirmed his conviction and sentence, but on application for rehearing, remanded the case to the district court for an evidentiary hearing on the Defendant's claim regarding intentional discrimination in the selection of the grand jury foreperson. *State v. Langley*, 95-1489 (La. 4/14/98), 711 So.2d 651, *reh'g granted in part* (La. 6/19/98). On remand, the district court granted the Defendant's motion to quash, finding the Defendant established a *prima facie* case of intentional discrimination which was not rebutted by the State. The supreme court affirmed the ruling and ordered further proceedings. *State v. Langley*, 95-1489 (La. 4/3/02), 813 So.2d 356.

The Defendant was subsequently reindicted on a charge of first degree murder, to which he pled not guilty and not guilty by reason of insanity. Because of great pretrial publicity, jury selection was moved to Orleans Parish, but the case was tried in Calcasieu Parish, where the sequestered jury was housed for the duration of the proceedings. The jury rejected the Defendant's insanity defense and convicted him of the lesser included offense of second degree murder, a violation of La.R.S. 14:30.1; he was then given the mandatory sentence of life imprisonment. It is from this conviction and sentence that the Defendant now appeals.

The Defendant's primary assignments of error in this appeal are that the trial judge erred in absenting himself during jury voir dire and closing arguments, in

2

cutting off closing arguments, and in prohibiting contemporaneous objections. He contends these errors compromised the very structure of the trial and require reversal without a showing of prejudice. Other assignments of error relate to evidentiary rulings, jury instructions, and alleged *Batson* violations in the jury selection process. The Defendant also complains of the trial court's improper references to the possibility of release after a not guilty by reason of insanity verdict and the State's failure to prove sanity as an element of the offense charged.

Regarding the Defendant's complaints concerning the trial judge's absences from the bench, the record does not reflect every absence, but the State has agreed with the Defendant's characterization of the judge's conduct. As this conduct necessarily has constitutional ramifications, we will address the Defendant's assignments of error in the context of both what the trial judge missed and the necessary adjustments made in the course of the proceedings to accommodate the judge's absence. The question to be resolved is whether the trial judge's conduct constitutes trial error, which is subject to review for harmless error, or structural error, which defies analysis by harmless error standards. *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246 (1991).

### III. ABSENCE OF THE TRIAL JUDGE

#### A. Voir dire

The Defendant contends the judge's absence during significant portions of voir dire was a structural error which requires reversal. He questions whether the trial court's actions constitute an abdication of his judicial responsibilities so as to deprive the parties of a fair trial. It is urged that in failing to observe potential jurors, the court was unable to respond meaningfully to challenges and objections and otherwise insure the empaneling of a fair and impartial jury. The judge's rulings on various

State challenges as well as a general *Batson* challenge are questioned by the defense given the fact that the judge was not present during questioning of numerous potential jurors.

The transcript of voir dire does not indicate when the judge entered or exited the courtroom, as the judge's minute clerk and court reporters did not record his entries and exits. However, comments by the judge indicate his intent to leave the courtroom, and both parties acknowledge that he did so at various points during voir dire:

> I'm going to spend about 10 or 15 minutes with the Court Administrator while y'all doing this stuff. You don't - - you don't need me. If you need me, just stop doing what you're doing and I'll be right back. But I'm not gonna address the jury, that's a waste of time. You guys just do what you gotta do.
>
> . . . .
>
> I've got to see the Court Administrator about transportation and a bunch of other stuff. So, they're going to start asking you questions. I don't want any objections while I'm gone, please. When I come back y'all can make your objections. Any questions before I leave?
>
> . . . .
>
> Okay. Good luck. All right. You may start.
>
> . . . .
>
> Now, also, again, I have many things to do this morning to prepare for this. I'll be in and out of here. If there's an objection or something, you will stop talking to that juror until I come back.
>
> . . . .
>
> Now, I'm gonna be in and out of here because I've got many things to do. I mean, my job is a hundred-fold.
>
> . . . .
>
> Don't think I'm not interested, I've just got things to do as far as accommodations, making sure everything's going right, making sure I can leave here tomorrow, make sure the jury can leave here tomorrow, making sure the defendant is transported by the sheriff's department

back to Calcasieu Parish, the whole bit. There are many things I've got to do, money, hotel bills I've got to pay for, everything. So, I've got - - and I gotta do this all today.

Our review of the record reveals several instances where the trial judge was absent during the questioning of a potential juror and that juror became the subject of a challenge for cause. The record makes clear the trial judge did not hear interrogation responses of at least five challenges for cause. Additionally, the record indicates the judge was absent for the questioning of a panel from which four jurors were peremptorily challenged by the State; the Defendant's subsequent *Batson* objection to those challenges, it is urged, could not be effectively addressed by the court due to the judge's absence.

The Defendant contends the trial judge's absences constitute reversible error. The State suggests the judge's absences were without objection by the Defendant and constitute merely harmless error. The State argues the judge did not intend to give up control of the proceedings inasmuch as he informed counsel that if an objection arose, they were to await his return. However, the Defendant argues the judge's failure to hear the jurors' responses certainly affected his ability to exercise discretion in ruling on challenges.

**B. Closing arguments**

In setting forth the procedure for closing arguments, the trial court established a two-hour time limit for each side. Counsel for the defense chose to divide both their time and the subject matter of their arguments, allocating forty-five minutes to Ms. Mann to discuss specific intent and seventy-five minutes to Mr. Smith to discuss the insanity defense. The State likewise divided its time between Ms. Wilson and Ms. Killingsworth. The trial judge prohibited objections during closing arguments, then

5

vacated the bench during those arguments. He informed the parties that he would be in chambers if anything got "crazy":

> I will be in and out of here. I'm going to take my dress off. Okay. Because there are no objections, there's no reason for me to – I'll stick my head in and see what's happening. Anything get crazy, just – I'll be in Chambers. Okay. Just let me know and I'll bring my gun and shoot somebody.

The transcript indicates the judge walked out just before the prosecutor began her closing argument. In fact, when Ms. Wilson addressed the Court with the typical, "May it please the Court," the judge was already gone and the court reporter noted laughter in the courtroom. The judge returned at the conclusion of Ms. Wilson's argument. He informed the jury the defense was then going to give its closing argument in two parts and he stated he would stay for "May it please the Court," and again leave the courtroom. When Ms. Mann finished her portion of the argument, the bailiff announced there would be a ten minute break. After the recess, the judge returned and stated the proceedings would continue with the Defendant's next argument, and he noted it was 11:34 a.m. at that point. He then exited the courtroom, and Mr. Smith began his portion of the defense's closing argument. At some point during Mr. Smith's argument, the judge stepped back into the courtroom and announced that counsel had two minutes remaining. Mr. Smith disagreed, to no avail. At his urging, the judge ultimately allowed Mr. Smith five minutes. Defense counsel states in brief that the bailiff, who was apparently keeping time for the closing arguments, informed the judge that he cut Mr. Smith's argument short, but the judge "refused to heed this advice." The State does not contest defense counsel's assertion that his argument was shortened.

As Ms. Killingsworth, the lead prosecutor, was beginning her rebuttal argument, the judge again exited the courtroom and, during the argument, Mr. Smith

6

interrupted her. Defense counsel states in brief that the Defendant suffered a "significant schizophrenic episode." Counsel characterizes the Defendant's behavior as a "psychotic break," during which he became increasingly agitated and disturbed. The Defendant began to rock himself and talk aloud. Ms. Killingsworth continued her argument while the judge was summoned. When he appeared several minutes later, the judge had the jury removed and determined that the Defendant should be taken out of the courtroom. Upon the jury's return, the judge gave the following explanation:

> My sincere apologizes [sic] for me interrupting this way, my apologies to you. Mr. Langley is no longer in court. The same instructions applies [sic] to you, please do not think that this is some tactic or something. It's simply so I can get this over with, you can get this over with. Okay? We're not going to get this over with at the State's expense or their expense. We've been fair, and we're going to be fair. Okay? I don't care how long it takes, we're going to be fair. Okay?

The prosecutor then completed her closing argument.

After closing arguments, several issues were taken up outside the presence of the jury, including the defense's objection to the judge's absence:

> I went up - - I want the record to reflect I went up to Ms. Killingsworth - - and you know, I hated to interrupt her, but I had to forewarn her of what was going on.
>
> She whispered to me that we needed the Judge. It took us four or five minutes to get the Court down here. And, you know, I'm just really concerned that this jury thinks that that's some sort of manipulative bullshit.

THE COURT:

> I've already instructed the jury.

MR. SMITH:

> I understand, Judge, but I'm just raising an objection to the fact that the Court wasn't present.

7

In this appeal, the Defendant contends the trial judge's absence from the courtroom during closing arguments was highly prejudicial in three respects and requires reversal of the conviction. He contends the trial judge's absence required that contemporaneous objections be prohibited, resulted in inaccurate timing of the arguments whereupon his lead counsel's argument was cut short by thirteen minutes, and set the stage for the prolonged episode of distress displayed by the Defendant during the State's rebuttal argument.

### 1. Contemporaneous objections

The Defendant contends the trial court prohibited contemporaneous objections during closing arguments so that he could exit the courtroom during the arguments. He cites *State v. Potter,* 591 So.2d 1166, 1169 (La.1991), which describes the fundamental purposes of the contemporaneous objection rule as, first, to place the trial judge on notice that a problem exists and, second, to give the court a chance to correct the alleged error before it infects the entire proceeding. He also relies on *State v. Prestridge,* 399 So.2d 564 (La.1981), for the proposition that a defendant has a right to make contemporaneous objections during closing arguments. The Defendant gives four instances during the State's closing argument where he would have objected and argues the prohibition was a structural error mandating reversal without a showing of prejudice.

The State contends the Defendant's failure to contemporaneously object to the prohibition prevents him from raising the issue on appeal. The record does reflect, however, that defense counsel had little opportunity, if any, to object before the judge left the courtroom. When the arguments were concluded, defense counsel lodged a general objection to the judge's absence and listed specific objections to the content of the prosecutor's argument.

8

## 2. Inaccurate timing

Defense counsel states he was allowed to argue for only sixty-two of his seventy-five minutes and thus was cut off thirteen minutes early. He proffered notes which outlined that portion of the argument he was forced to abandon. While recognizing that a trial court generally has authority to curtail arguments, the Defendant argues that is done only when there is a reasonable basis such as repetitiveness, inappropriateness, or wandering beyond the scope of the argument, but here, there was no reasonable basis for cutting off counsel's argument. He contends his counsel prepared and coordinated their arguments based upon the assurance that they had two hours to present their argument to the jury. The topics argued by one attorney were not to be addressed by the other. The Defendant's plea in this case was not guilty and not guilty by reason of insanity, and what Mr. Smith intended to cover was pertinent to the issue of whether the Defendant was insane at the time of the commission of the offense. The trial judge was not present during the majority of the closing arguments, and, thus, the Defendant urges us to find the act of shortening counsel's time could not have been based on a concern that allowing counsel the full duration of the argument would result in repetitiveness.

The Defendant relies on *Herring v. New York,* 422 U.S 853, 95 S.Ct. 2550 (1975), a case which set forth both the importance of a defendant's right to a closing summation and the necessary discretion of the trial judge in controlling closing arguments. He then cites *State v. Washington,* 614 So.2d 711 (La.1993), where a defendant's conviction was reversed based on defense counsel's insufficient time to fully and completely present a closing argument to the jury.

The State contends defense counsel was given a generous amount of time to present argument and this time was "more than ample to portray and summarize the

9

defense theory of the case to the jury." Additionally, the State contends the defense cannot establish that anything it had intended to say during those thirteen minutes would have impacted the jury or altered the verdict. While conceding the better course of action would have been for the judge to allow the defense its entire allotted time, the State argues the judge has discretion in controlling, limiting and terminating closing arguments, and his actions should not be considered reversible error.

### 3. Psychotic episode

Defense counsel contends the trial judge's absence during closing arguments magnified and prolonged the problems caused by the Defendant's psychotic episode. He argues that both the Defendant's actions and the need for counsel to interrupt the prosecutor were highly prejudicial, perhaps leading the jury to find the episode was staged or manipulated and designed either to gain sympathy for the Defendant or to disrupt the prosecutor. Defense counsel contends the entire episode could have been dealt with promptly and spontaneously had the judge been present on the bench when it began.

The State argues the Defendant must once again show prejudice for this alleged error to be reversible. Further, the State contends that, rather than prejudice, the episode probably served to bolster the Defendant's insanity defense and could not have been prevented or controlled by the trial judge's presence.

### IV.  FAILURE TO MAINTAIN ORDER AND DECORUM

The trial judge has primary responsibility for maintaining order and decorum in the courtroom and must control criminal proceedings so as to insure that justice is done. *See* Code Crim. P. art. 17. We recognize that the trial judge's intent in the instant case may have been to create a casual atmosphere to put jurors at ease and make them feel welcome; however, the trial judge not only failed to maintain order

and decorum but also actively contributed to creating an aura of jocularity inappropriate to the gravity of the proceedings.

Combined with the trial judge's casual comings and goings from the courtroom were his ongoing jokes, light-hearted comments, and irreverent attitude towards the proceedings at hand. During voir dire, he kept up a running joke about the New Orleans venire members not looking forward to a two-week stay in "beautiful Lake Charles," where quite a bit of the court's money would be spent on housing them nicely and feeding them well. He made a point to tell prospective jurors that he did not want to be in court on this case any more than they did. In addition to divulging a myriad of details about his personal life, the trial judge told lawyer jokes implying dishonesty, used potentially offensive slang and referred to witnesses and jurors casually and colloquially. To one group of prospective jurors, he explained the position of the Catholic Church and the Pope on the death penalty; to another he noted his disagreement with the theory that pedophiles "just can't help it" when they molest children. Throughout the proceedings, and especially during voir dire, the trial judge peppered the record with facetious comments and remarks that served to undermine the gravity of this most serious first degree murder trial.

## V. LEGAL PRECEDENT

We find the trial judge's absences from jury voir dire and closing arguments, coupled with his jocular attitude towards the proceedings, constitute legal error. We must necessarily determine whether this error is a "trial error" or a "structural error," as the consequences of the two types differ substantially. In *State v. Jones,* 98-1165, p. 5 (La.App. 3 Cir. 2/3/99), 734 So.2d 670, 673, this court, citing *Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, defined the terms as follows:

> A "trial error" is one which occurs during the presentation of the case to the jury and can be quantitatively assessed in the context of other

11

evidence presented to prove guilt. A "structural error" affects the framework within which the trial proceeds, rather than an error in the trial process. It defies harmless error standards and cannot be quantitatively measured.

*See also, State v. Hampton,* 00-0522 (La. 3/22/02), 818 So.2d 720; *State v. Brown,* 03-1747 (La.App. 3 Cir. 5/12/04), 874 So.2d 318.

The Defendant relies on *Gomez v. U.S.,* 490 U.S. 858, 109 S.Ct. 2237 (1989), in urging this court to find structural error in the judge's absence during voir dire. In *Gomez*, the court was called upon to determine whether the authority to preside over voir dire was within the duties a magistrate may be assigned under the Federal Magistrates Act. In determining this was not a duty which may be assigned, the court explained:

> In any event, we harbor serious doubts that a district judge could review this function meaningfully. Far from an administrative impanelment process, *voir dire* represents jurors' first introduction to the substantive factual and legal issues in a case. To detect prejudices, the examiner—often, in the federal system, the court—must elicit from prospective jurors candid answers about intimate details of their lives. The court further must scrutinize not only spoken words but also gestures and attitudes of all participants to ensure the jury's impartiality. See, *e.g., Wainwright v. Witt*, 469 U.S. 412, 428, *n.* 9, [105 S.Ct. 844, 854, n. 9] (1985) (quoting *Reynolds v. United States*, 98 U.S. 145, 156-157, 25 L.Ed. 244 (1879)). But only words can be preserved for review; no transcript can recapture the atmosphere of the *voir dire*, which may persist throughout the trial. Cf. *Waller v. Georgia*, 467 U.S. 39, 49, n. 9, [104 S.Ct. 2210, 2217, n. 9] (1984) ("While the benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance, the Framers plainly thought them nonetheless real"). The absence of a specific reference to jury selection in the statute, or indeed, in the legislative history, persuades us that Congress did not intend the additional duties clause to embrace this function.

*Id.* at 874-76, 109 S.Ct. at 2247-48 (footnotes omitted).

The *Gomez* court found "harmless-error analysis does not apply in a felony case in which, despite the defendant's objection and without any meaningful review by a district judge, an officer exceeds his jurisdiction by selecting a jury." *Id.* at 876, 109 S.Ct. at 2248.

In the instant case, the trial judge did not merely relinquish the right to review another court officer's conduct of voir dire; rather, he abandoned his responsibility to oversee voir dire and, therefore, compromised his own ability to exercise discretion in ruling on challenges. This type of error impinges on the foundation of the trial, *i.e.*, jury selection, and affects the framework on which the entire proceedings are built.

Turning to the arguments asserted by the defense on the closing summation problems, we again look to federal jurisprudence for guidance on these issues. In *U.S. v. Mortimer*, 161 F.3d 240 (3rd Cir. 1998), the judge absented himself without notice sometime after the state's closing argument. Shortly after defense counsel began her argument, the prosecutor noticed the judge was absent. The judge returned to the courtroom in time to thank defense counsel and to call for rebuttal argument. In finding structural error occurred, the *Mortimer* court stated:

> A trial consists of a contest between litigants before a judge. When the judge is absent at a "critical stage" the forum is destroyed. *Gomez v. United States*, 490 U.S. 858, 873, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989). There is no trial. The structure has been removed. There is no way of repairing it. The framework "within which the trial proceeds" has been eliminated. *See Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The verdict is a nullity. *Gomez*, 490 U.S. *at* 876, 109 S.Ct. 2237 (1989).

> We cannot, of course, anticipate every circumstance under which the judge's absence may destroy the structure. The structure normally stands if the parties consent to excuse the presence of a judge. *Id.* at 870, 109 S.Ct. 2237; *United States v. Love*, 134 F.3d 595, 605 (4th Cir.), *cert. denied*, [524] U.S. [932], 118 S.Ct. 2332, 141 L.Ed.2d 705 (1998); *Stirone v. United States*, 341 F.2d 253, 256 (3d Cir.), *cert. denied*, 381 U.S. 902, 85 S.Ct. 1446, 14 L.Ed.2d 284 (1965). No consent occurred here. Before whom was defense counsel to offer consent? That defense counsel continued her summation cannot be construed as consent. Was she to stop in midsentence as it were and wait for such time as the judge should reappear? She did her best under the circumstances but her carrying on in adversity cannot be turned into agreement to the judge's absence.

The government contends that the defense must show prejudice. The government relies on *Love* and *Stirone* where consent made the difference and on two cases, *Haith v. United States*, 342 F.2d 158, 159 (3d Cir.1965) and *United States v. Boswell*, 565 F.2d 1338, 1341-42 (5th Cir.), *cert. denied*, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978), which have been made obsolete by *Gomez, supra*. An additional case, *United States v. Pfingst,* 477 F.2d 177, 195-96 (2d Cir.), *cert. denied*, 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973), invoked by the government, does not bear on what happened here; it involved a judge's announced absence from the state for a short time during jury deliberations. *Id.* at 196. A single case, *Heflin v. United States*, 125 F.2d 700, 700 (5th Cir.), *cert. denied*, 316 U.S. 687, 62 S.Ct. 1276, 86 L.Ed. 1759 (1942), is cited by the government where the judge was unexpectedly absent when the jury and counsel were in the courtroom. The absence was two or three minutes and explained as a trip to an adjacent lavatory. This precedent is not close enough to be persuasive and it belongs to an era when structural error was not the criterion. Prejudice to the defendant from the jury inferring that the defense was not worth listening to may have occurred; it is not necessary on this appeal for the defendant to demonstrate it. The structural defect determines the result.

*Id.* at 241-42.

In *Riley v. Deeds*, 56 F.3d 1117 (9th Cir. 1995), during jury deliberations, the jury requested that the victim's testimony be read back to them. The trial judge could not be located, so in his absence, court was convened by his law clerk. The law clerk informed the jury that the victim's testimony would be read to them and that the foreman should indicate when the jury had heard enough. The foreman of the jury did so after the victim's direct testimony was read. Concluding this constituted error, the court reasoned:

A judge's absence during a criminal trial, including court proceedings after a jury begins deliberations, is error of constitutional magnitude. *See Peri v. State*, 426 So.2d 1021, 1023-24 (Fla. Dist.Ct.App.1983) (listing state court cases recognizing this principle). The presence of a judge is at the "very core" of the constitutional guarantee of trial by an impartial jury. *Id.* at 1023. "This proposition has been so generously admitted, and so seldom contested, that there has been little occasion for its distinct assertion." *Id.* (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 13-14, 19 S.Ct. 580, 585-86, 43 L.Ed. 873 (1898)).

*Id.* at 1119.

14

It is evident from the jurisprudence that the determination of whether an error or combination of errors is structural defies a strict formulaic evaluation. Rather, the determination will turn on a case by case analysis of the egregiousness of the complained of conduct, the constitutional ramifications of the error, and the degree of damage caused to the framework of the proceedings. It may be that a single error is of sufficient gravity to destroy the forum and thus constitute structural error. Likewise, an accumulation of less serious errors, when taken as a whole, may so undermine the framework of the proceedings as to rise to the level of a structural error.

Our review of the record and the aforementioned jurisprudence compels us to find the errors committed by the trial judge, in absenting himself from these proceedings and failing to maintain decorum, were structural errors requiring reversal of the Defendant's conviction without a showing of actual prejudice. We base this decision not merely on the judge's actions in leaving the courtroom, but also on the consequences of those actions, *i.e.,* the inability to adequately and appropriately oversee voir dire and rule on challenges, the necessity of prohibiting contemporaneous objections during closing arguments, the miscalculation–or even the appearance of miscalculating–the allotted time for closing arguments, and the unavailability of an authoritative figure in the courtroom to immediately squelch disruptions. Those consequences, combined with an air of frivolity, destroyed the framework of the trial itself and require reversal. "Equally basic is a defendant's right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside." *Gomez,* 490 U.S. at 876, 109 S.Ct. at 2248.

15

## VI. EFFECT OF ABSOLUTELY NULL VERDICT

The State requests, if this court finds the errors concerning the trial judge's absences are structural, that this court declare the Defendant's trial a nullity and allow the State to proceed to a new trial under the original first degree murder charge. The State's requests are part of the record, and justice would not be served in failing to address the issue. In support of its position, the State cites language from *Mortimer,* 161 F.3d at 241 which states that the forum is destroyed when the judge is absent and there is no trial. The *Mortimer* court reversed the district court judgment and remanded the case for a new trial.

Article 595 of the Louisiana Code of Criminal Procedure provides in part that a "person shall not be considered as having been in jeopardy in a trial in which: (1) The court was illegally constituted . . . ." The 1966 Official Revision Comment to Article 595 offers the following explanation of the statutory language:

> [I]f the proceedings were absolutely null because the court lacked jurisdiction, or because the indictment had absolutely no legal effect, or because of some error or defect not cured by defendant's failure to object, the first trial, whatever its result, cannot be used by the defendant on the second trial to support a plea of double jeopardy, because he was not in danger on the first trial, either in law or fact.

La.Code Crim.P. art. 595, cmt.(a)(1).

Generally, in Louisiana, if there are curable defects or errors in a defendant's first trial, he will either object and obtain relief or his failure to object will operate to cure the defects or errors. However, if the error or defect is not curable, as in the instant case, the defendant has necessarily not been in jeopardy because of the presence of the error or defect. *See* La.Code Crim.P.art. 595, cmt.(b).

Our supreme court discoursed on this issue in *State v. Goodley,* 423 So.2d 648 (La.1982), wherein it was determined that an illegally obtained manslaughter verdict did not bar retrial for first degree murder based on double jeopardy. Subsequently,

in *State v. Campbell,* 95-1409 (La. 3/22/96), 670 So.2d 1212, the court held the defendants could be retried for jury tampering after a jury returned an invalid verdict of guilty of attempted jury tampering. Cases such as these which involve an invalid jury verdict or structural error affecting the framework of the trial itself fall outside the general rule articulated in La.Code Crim.P. art. 598. Article 598 provides that when a defendant is found guilty of a lesser degree of the offense charged, the verdict acts as an acquittal of all greater offenses charged in the indictment. However, when a structural error destroys the validity of the proceedings, the trial and resulting verdict are an absolute nullity and can have no effect whatsoever.

The United States Supreme Court addressed the issue in *Sattazahn v. Pennsylvania,* 537 U.S. 101, 123 S.Ct. 732 (2003), a case where the defendant was convicted of first degree murder, but the jury deadlocked in the penalty phase. The jury was unable to agree on whether an aggravating circumstance warranted the death penalty; the trial judge, following state law, then entered a life sentence. The Supreme Court held there was no double jeopardy bar to the state's seeking the death penalty on retrial after the defendant's successful appeal.

In *Goodley*, the court addressed double jeopardy issues which arise when an illegal verdict is found. The court succinctly explained:

> Where no valid judgment has been obtained, the defendant's double jeopardy interests simply cannot be considered to extend so far as to compel society to relinquish its interest in punishing one whose guilt is clear by means of a fair and procedurally accurate trial.
>
> This principle has been implicitly recognized and followed in Louisiana. In the case of *State v. Cook*, 396 So.2d 1258 (La.1981) a patent error review revealed an invalid verdict which necessitated the reversal of the defendant's conviction. In ordering the reversal, this court held that retrial of the defendant was proper because "there was no legal verdict rendered, either of conviction or of acquittal". *Cook*, supra at 1261. Although the *Cook* opinion does not directly address the double jeopardy issue, its holding does implicitly recognize that the double

jeopardy protection simply does not extend to a situation in which no verdict, either of conviction or acquittal, has been rendered.

It therefore becomes evident that the prohibition against double jeopardy does not operate to bar Goodley's retrial for the crimes of first degree murder or manslaughter. Although there is no doubt that jeopardy did attach in Goodley's initial trial for first degree murder, such jeopardy is not regarded as having come to an end so as to bar a subsequent prosecution for either first degree murder or manslaughter. Under the Fifth Amendment, where a non-waivable defect, such as an illegal verdict, prevents a jury from delivering either a conviction or acquittal at a defendant's first trial, that defendant cannot avail himself of the plea of double jeopardy.

*Goodley,* 423 So.2d at 651.

The *Goodley* and *Mortimer* cases characterize the verdict resulting from structural error as a nullity. The concept of nullity in criminal proceedings has long been distinguished from mere error, the latter of which may or may not affect the validity of the verdict. In describing the finality of a criminal verdict at a time when convictions were not appealable, Chief Justice Marshall, in 1830, explained that a judgment could not be unlawful, "unless that judgment be an absolute nullity." *See* Berkowitz, "Error-Centricity, Habeas Corpus and the Rule of Law as the Law of Rulings," 64 La.L.Rev. 477, 486 (2004), *citing Ex Parte Watkins,* 3 Pet. 193, 202-03 (1830).

The necessary consequence of such a verdict is retrial, as though no verdict had been reached. *State v. Self,* 00-633 (La.App. 3 Cir. 11/2/00), 772 So.2d 337. In *State v. Norman,* 34,868 (La.App. 2 Cir. 10/31/01), 799 So.2d 619, the court noted that principles of double jeopardy do not preclude retrial of a defendant whose conviction is set aside because of judicial error. Similarly, in *State v. Williams,* 00-1725, p. 9 (La. 11/28/01), 800 So.2d 790, 798, the supreme court explained:

It is well settled that "the chilling [effect on] appeals does not in and of itself offend due process." *United States v. Henry*, 709 F.2d 298, 316 n. 26 (5th Cir.1983). More specifically, due process is not offended by all possibilities of increased punishment after appeal, only by those

which involve "actual retaliatory motivation" or "pose a realistic likelihood of 'vindictiveness'." *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *Henry*, 709 F.2d at 315-16.

Our opinion should not be construed as an instruction to the district attorney on how to charge the defendant upon remand. Clearly, under Article 61 of the Code of Criminal Procedure, we have no authority to tell the district attorney how to handle any prosecution of this matter in the future. Rather, we have described the effects of an absolutely null judgment of conviction: It is as though the conviction never occurred. Consequently, it is within the discretion of the district attorney to exercise any of the prosecutorial options available to the State of Louisiana upon remand.

## DECREE

In view of the foregoing, we reverse the Defendant's conviction and sentence and remand for retrial consistent with the views expressed herein.

**REVERSED AND REMANDED.**

**STATE OF LOUISIANA**

**VERSUS**

**RICKY J. LANGLEY**


THIBODEAUX, C.J., concurring in part and dissenting in part.

I agree with Parts I, II, III, and V of the majority opinion. I disagree that Parts IV and VI are necessary in deciding this case for the following reasons.

Structural error deals with legal transgressions. The majority addresses what appears to be ethical mishaps in Part IV. Even if these implied ethical transgressions had not occurred, the structural errors would still exist and would require reversal.

Part VI entitled "Effect of Absolutely Null Verdict" is advisory. We must remember that it is the defendant who appealed. None of the fifteen assignments of error asserted by the defendant deal with the effect of an absolutely null verdict. The consequences of a reversal was addressed at oral argument only when, somewhat presciently, the State determined that its position was quite tenuous. The Louisiana Constitution implicitly prohibits us from issuing advisory opinions. Absent a justiciable issue that is brought by adverse parties with opposing claims, judicial determination of any action by a court is improper. *Perschall v. State*, 96-0322 (La. 7/1/97), 697 So.2d 240. The issues of double jeopardy and the character

of the charge upon remand are simply not before us. We typically address only those issues or specifications of error that were presented to the trial court and which are properly before us.

Moreover, the majority's opinion clearly states that: "[t]he question to be resolved is whether the trial judge's conduct constitutes trial error, which is subject to review for harmless error, or structural error, which defines analysis by harmless error standards." That is exactly what we are asked to decide. Nothing more and nothing less.

However, to the extent that the majority feels it is necessary to respond to the State's request at oral argument to proceed upon remand with a first degree murder charge, I am compelled to respond.

*State v. Goodley*, 423 So.2d 648 (La.1982) supports the *defendant's*, not the State's, position. The defendant was charged with first degree murder but convicted of manslaughter. The defendant appealed on the basis of excessiveness. His conviction was reversed on the basis of a patent error. The State sought to retry him on first degree murder. He filed a motion to quash. The Louisiana Supreme Court agreed that *double jeopardy* would not bar retrial of the defendant on a first degree murder charge, as stated in the majority opinion. However, the *Goodley* court said that, while double jeopardy did not bar retrial, there were *other* constitutional protections which did. The Louisiana Supreme Court specifically held that . . . "we are of the opinion that *to retry Goodley for the crime of first degree murder would be inconsistent with the right to appeal in Louisiana.*" *Id*. at 650. It forbade the trial court from retrying the defendant on a first degree murder charge based on Article 1, § 19 of the Louisiana Constitution which guarantees that a defendant in felony cases has a right to appeal. Similarly, to retry Langley on first degree murder would be

2

inconsistent with the right to appeal based on Article 1, § 19 of the Louisiana Constitution. That is exactly what *Goodley* held. In *Goodley*, the supreme court held that the State's actions in attempting to retry Goodley on a first degree murder charge would be unconscionable. Similarly, to retry Langley in this present case on a first degree murder charge, as the State suggests, would be unconscionable.

Likewise, *State v. Campbell*, 95-1404 (La. 2/22/96), 670 So.2d 1212 does not support allowing the State to retry the defendant on a first degree murder charge. In *Campbell*, the jury rendered an improper responsive verdict. The defendant was convicted of "attempted jury tampering." On appeal, his convictions and sentences were vacated. When defendant was charged with jury tampering, the jury returned a verdict of attempted jury tampering. Attempted jury tampering was not a valid crime. The court concluded that it could not "say that the jury's return of the purportedly lesser verdicts of attempt necessarily and implicitly acquitted [defendant] of any material element of the crime charged." Consequently, retrial of the defendant of the original charged offense of jury tampering with correct instructions was held not to constitute double jeopardy. The *Campbell* circumstances are not present in this case.

*Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S.Ct. 732 (2003) is easily distinguishable for the present case and does not support allowing the State to retry Langley on a first degree murder charge after his successful appeal of his second degree murder conviction. The issue in *Sattazahn* was *not* whether the State could retry the defendant on first degree murder charges after his conviction was reversed on the same charges. *Sattazahn* decided the sentence enhancement of death as opposed to the life sentence he received from the first conviction. Thus, the *Sattazahn* court was faced with the issue of whether double jeopardy applied to

3

capital *sentencing* proceedings. In *Sattazahn*, the defendant did not attack his conviction of first degree murder, but the fact that on retrial, he was subject to the peril of receiving the death penalty. It is clear that the constitution does not limit the imposition of a harsher sentence after conviction upon retrial. *See North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072 (1969). However, that harsher sentence must be for the *same* offense, not for a harsher offense for which one has been acquitted by virtue of being found guilty of a lesser included offense. *See* La.Code Crim.P. art. 598.

State v. Self, 00-633 (La.App. 3 Cir. 11/12/00), 772 So.2d 337 did conclude that the double jeopardy provision of the Fifth Amendment does not bar retrial of the defendant. However, the issue of whether any *other* constitutional provisions or protections, such as Article 1, § 19 of the Louisiana Constitution, would bar retrial on the original charge was not discussed as it was in *State v. Goodley*.

State v. Williams, 00-1725 (La. 11/28/01), 800 So.2d 790 referred to the correction of an illegal sentence and involved increased *punishment*. The possibility of an increased punishment upon remand is constitutionally permissible, according to *North Carolina v. Pearce*. *Williams* did not refer to remand for retrial on a more severe charge than that for which one was convicted. In *State v. Normand*, 34,868 (La.App. 2 Cir. 10/31/01), 799 So.2d 619, the court concluded that double jeopardy does not preclude retrial on the *same* charge. To find the defendant guilty of both theft and illegal possession of stolen goods would be double jeopardy. However, double jeopardy did not prevent retrial on either charge. Hence, the retrial must be on the *same* charge for which the defendant was convicted or on a lesser charge.

For the foregoing reasons, I respectfully concur in part and dissent in part.

4