IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
May 31, 2012 Session Heard at Lipscomb University

**DAVID KEEN v. STATE OF TENNESSEE**

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P25157      Chris Craft, Judge**

---

**No. W2011-00789-SC-R11-PD - Filed December 20, 2012**

---

GARY R. WADE, C.J., dissenting.

In <u>Van Tran v. State</u>, 66 S.W.3d 790, 792 (Tenn. 2001), this Court held that "the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution prohibit the execution of [intellectually disabled] individuals because such executions violate evolving standards of decency that mark the progress of a maturing society, are grossly disproportionate, and serve no valid penological purpose in any case." The next year, the United States Supreme Court reached the same conclusion:

> We are not persuaded that the execution of [intellectually disabled] criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our "evolving standards of decency," we therefore conclude that such punishment is excessive and that the Constitution "places a substantive restriction on the State's power to take the life" of a[n intellectually disabled] offender.

<u>Atkins v. Virginia</u>, 536 U.S. 304, 321 (2002) (quoting <u>Ford v. Wainwright</u>, 477 U.S. 399, 405 (1986)). The import of these decisions is clear: executing intellectually disabled individuals is unlawful under both the state and federal constitutions.[1] In my

---

[1] As noted in the majority opinion, the Tennessee General Assembly legislatively prohibited the execution of intellectually disabled persons prior to these decisions. Act of Apr. 12, 1990, ch. 1038, 1990

(continued...)

view, the majority's interpretation of the Post-Conviction Procedure Act ("PCPA") unnecessarily deprives David Keen (the "Petitioner") of an adequate opportunity to prove that he is ineligible for the death penalty based on evidence that did not exist either at the time of trial or at his initial post-conviction proceeding. In consequence, I must respectfully dissent.

## I.

As observed by the majority, this case requires us to interpret Tennessee Code Annotated section 40-30-117 (2006), the statute within the PCPA pursuant to which the Petitioner seeks to reopen his post-conviction proceedings. In my view, the key provision of the statute in this case is section 40-30-117(a)(2), which allows a petitioner to reopen his post-conviction proceedings "based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted."[2]

On August 6, 2010, the Petitioner filed a motion to reopen his post-conviction proceedings in order to assert a claim that he is intellectually disabled and, therefore, ineligible to be executed under Tennessee Code Annotated section 39-13-203, article I, section 16 of the Tennessee Constitution, and the Eighth Amendment to the United States Constitution. In order to prevail on a claim of intellectual disability, the person claiming such disability must satisfy the following criteria: "(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below; (2) Deficits in adaptive behavior; and (3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age." Tenn. Code Ann. § 39-13-203(a). In support of his motion to reopen, the Petitioner offered evidence as to each of these requirements. Initially, he provided documentation demonstrating that in February of 2010, he received a full scale I.Q. score of 67 on the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). Further, he submitted an affidavit from a psychologist, who called into question the validity of previous I.Q. test scores—the

---

(...continued)
Tenn. Pub. Acts 730 (codified as amended at Tenn. Code Ann. § 39-13-203 (2010)).

[2] Because I believe that the Petitioner has satisfied section 40-30-117(a)(2), I would not reach the question of whether he is entitled to reopen his post-conviction proceedings pursuant to section 40-30-117(a)(1) (allowing a petitioner to reopen post-conviction proceedings within one year of "a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required").

majority of which fell within the low 70s to low 80s range—and reported that the Petitioner had significant deficits in adaptive behavior which manifested before the age of eighteen. The psychologist also opined that the new WAIS-IV score should be adjusted from 67 to 66 because of the Flynn effect. The Petitioner obtained this information some four years after the Court of Criminal Appeals affirmed the denial of his initial post-conviction petition.

The trial court denied the motion to reopen without an evidentiary hearing, concluding that proof of ineligibility for the death penalty was insufficient to establish actual innocence for purposes of section 40-30-117(a)(2). The Court of Criminal Appeals affirmed.

Preliminarily, I would observe that a fundamental rule of statutory construction is that this Court has "an obligation to interpret statutes in a way that preserves their constitutionality." Jackson v. Smith, ___ S.W.3d ___, ___, No. W2011-00194-SC-R11-CV, 2012 WL 5828612, at *6 (Tenn. Nov. 16, 2012) (citing Jordan v. Knox Cnty., 213 S.W.3d 751, 780-81 (Tenn. 2007)). If possible, we should avoid an interpretation of legislation that "places it on a collision course" with the state or federal constitutions. Id. This principle gives rise to two questions relevant to this appeal: (1) whether interpreting Tennessee Code Annotated section 40-30-117(a)(2) so as to bar a claim based upon newly acquired evidence of intellectual disability would bring the statute in conflict with the state or federal constitutions; and (2) if so, whether the statute may reasonably be interpreted to avoid this constitutional conflict. I would answer both of these questions in the affirmative.

## A.

This Court's prior decisions have established that a prisoner's due process rights under the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution require a meaningful opportunity to challenge a conviction or sentence in post-conviction proceedings. In Burford v. State, 845 S.W.2d 204, 206-10 (Tenn. 1992), this Court addressed the constitutionality of a former version of Tennessee Code Annotated section 40-30-102 (1990), which had established a three-year statute of limitations for filing a petition for post-conviction relief. Following Burford's conviction, his sentence was enhanced because of multiple prior convictions; when several of his prior convictions were ultimately set aside, he sought relief from the enhanced sentence even though more than three years had passed. Id. at 206. The Court observed that Burford's

challenge to his sentence depended upon having his prior convictions set aside, which he was unable to accomplish within the time limit imposed by the post-conviction statute of limitations.  Id. at 208.  Because the statute, as applied, deprived Burford of a "reasonable opportunity" to present a post-conviction claim challenging the validity of his sentence, the Court ruled that the statutory limitations period violated his constitutional right of due process.  Id.  In reaching this conclusion, the Court found that Burford's "interest against serving an excessive sentence in violation of his constitutional rights" outweighed the State's interests in "administrative efficiency and economy" and in "preventing the litigation of stale and fraudulent claims."  Id. at 209 ("In criminal litigation, where an alleged infringement of a constitutional right often affects life or liberty, conventional notions of finality associated with civil litigation have less importance, and 'the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.'" (citation omitted) (quoting I.N.S. v. Chadha, 462 U.S. 919, 944 (1983))).[3]

More recent cases have reaffirmed the validity of the due process analysis employed in Burford.  See, e.g., Williams v. State, 44 S.W.3d 464 (Tenn. 2001) (recognizing a possible due process violation based upon counsel misrepresenting the fact that appellate review was being sought); Seals v. State, 23 S.W.3d 272 (Tenn. 2000) (recognizing a possible due process violation where mental incompetence prevents an inmate from filing a post-conviction petition); Sands v. State, 903 S.W.2d 297 (Tenn. 1995) (providing a three-part test for applying Burford and noting that courts should consider whether the grounds for the claim at issue arose after the statute of limitations began to run).  In Smith v. State, 357 S.W.3d 322, 358 (Tenn. 2011), we observed that the "pervasive theme" in cases in which a procedural limitation violated a petitioner's due process rights "is that circumstances *beyond a petitioner's control*" prevented compliance with the procedural limitation at issue.

Applying the same rationale, this Court has held that post-conviction petitioners must be given a meaningful opportunity to present claims of intellectual

---

[3] The PCPA, originally enacted three years after Burford, includes an exception to the statute of limitations for claims seeking relief from a sentence enhanced because of a previous conviction that has subsequently been held invalid.  See Tenn. Code Ann. § 40-30-102(b)(3) (2010).  The PCPA includes a nearly identical provision allowing petitioners to reopen post-conviction proceedings when a prior conviction used to enhance a sentence is set aside subsequent to the adjudication of an initial post-conviction petition.  See id. § 40-30-117(a)(3).

disability. In Van Tran, for example, this Court held that the petitioner was entitled to relief under Tennessee Code Annotated section 40-30-217(a)(1) (1997), which, like the current version of section 40-30-117(a)(1), allowed post-conviction proceedings to be reopened "based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required." 66 S.W.3d at 811-12. This Court acknowledged that Van Tran had not strictly complied with section 40-30-217(a)(1) in that his motion to reopen did not assert a final appellate ruling establishing the unconstitutionality of executing intellectually disabled persons. Nevertheless, the Court permitted his challenge, holding that "fundamental fairness dictates that [he] have a meaningful opportunity to raise th[e] issue [of intellectual disability]." Id. at 812 (citing Williams, 44 S.W.3d at 464; Seals, 23 S.W.3d at 272). The Court declined to interpret section 40-30-217(a)(1) as a bar to Van Tran's claim because, under such an interpretation, a "potentially [intellectually disabled] person [could] be executed before the issue is reviewed." Id. Similarly, in Howell v. State, 151 S.W.3d 450 (Tenn. 2004), we held that application of the stringent "clear and convincing evidence" standard of Tennessee Code Annotated section 40-30-117(a)(4) would violate the petitioner's due process rights because, "[a]s in Burford, Williams, and Seals, the petitioner [was] confronted with circumstances beyond his control which prevented him from previously challenging his conviction and sentence on constitutional grounds." Id. at 462 (emphasis added).

One of the factors distinguishing Burford and its progeny from the instant case is that the procedural limitation here is not a statute of limitations but rather a statute that defines the circumstances under which a prisoner may reopen his post-conviction proceedings. In my view, this is not a material distinction. By providing a limited number of avenues for reopening a post-conviction petition, Tennessee Code Annotated section 40-30-117(a) operates as a procedural bar to claims that do not fall within its narrowly defined provisions. There is no rational basis for a distinction between a procedural bar based upon a time limitation for filing and a procedural bar that operates by restricting a petitioner's ability to reopen his post-conviction proceedings. Both Van Tran and Howell applied the rationale of Burford to procedural limitations that did not involve a time limitation, and the PCPA includes nearly identical provisions pertaining to both types of procedural bars. See Tenn. Code Ann. §§ 40-30-102(b)(3), 40-30-117(a)(3).

Another question is whether the facts presented here qualify as circumstances

beyond the Petitioner's control that prevented him from making his claim at an earlier stage. See Smith, 357 S.W.3d at 358. The majority distinguishes Van Tran and Howell, explaining that unlike in those cases, the Petitioner was not without a legal remedy either during his trial or when he filed his initial post-conviction petition. While that is an accurate statement, this Court has previously established that due process precludes application of a procedural bar that would deny a reasonable opportunity to bring a claim that was previously unavailable because its factual grounds did not yet exist. See Sands, 903 S.W.2d at 301 ("[D]ue process prohibits the strict application of the post-conviction statute of limitations to bar a petitioner's claim when the grounds for relief, whether legal or factual, . . . arise after the point at which the limitations period would normally have begun to run." (emphasis added)).

In this instance, the key piece of evidence in the motion to reopen is the I.Q. test score of 67 from February of 2010. While the Petitioner had undergone intelligence testing in the past, this new score provided a significantly stronger indication of intellectual disability than previous tests. When made aware of this score, the Petitioner acted diligently by filing a motion to reopen accompanied by expert testimony calling into question the validity of his earlier I.Q. test scores.[4] It is my opinion that his motion to reopen represents his first meaningful opportunity to present an intellectual disability claim. Further, the Petitioner's interest in obtaining a hearing to present newly discovered evidence that may render him ineligible for the death penalty far outweighs any governmental interest in barring his claim, including the State's interest in the finality of judgments. See Howell, 151 S.W.3d at 462 (finding that a capital petitioner's interest "in protecting his very life" outweighs the governmental interest in the finality of judgments); see also Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001) ("[The petitioner's] interest in obtaining a hearing to present newly discovered evidence that may establish actual innocence of a capital offense far outweighs any governmental interest in preventing the litigation [of] stale claims.").

As this Court has previously acknowledged, intellectual disability "is a difficult condition to accurately define," Howell, 151 S.W.3d at 457, and both legal and clinical practitioners face a host of challenges when attempting to assess a particular

---

[4] For the same reasons, I would hold that this new evidence of intellectual disability qualifies as "new scientific evidence" for purposes of Tennessee Code Annotated § 40-30-117(a)(2).

individual's I.Q.  See Coleman v. State, 341 S.W.3d 221, 242 & n.55 (Tenn. 2011). Given these difficulties, it is not surprising that crucial evidence may be discovered after the expiration of the statute of limitations for filing a post-conviction petition. The interpretation of Tennessee Code Annotated section 40-30-117(a)(2) adopted by the majority would bar any intellectually disabled death row inmate from reopening a post-conviction proceeding—even an inmate without fault in his discovery of the evidence of the disability after the expiration of the limitations period.  In my assessment, due process requires this Court to interpret section 40-30-117(a)(2) in a manner that allows a meaningful opportunity to assert a claim of intellectual disability based upon newly discovered evidence and, consistent with Van Tran, to avoid a situation in which an "[intellectually disabled inmate] may be executed before the issue is reviewed."[5]  66 S.W.3d at 812; see also Stewart v. Martinez-Villareal, 523

_____

[5] The majority specifies that its decision does not foreclose any other remedy currently available to the Petitioner, but the opinion does not identify any such remedy.  One possibility the Petitioner may pursue is a petition for a writ of error coram nobis.  See Tenn. Code Ann. § 40-26-105 (2012).  Yet while this Court has recognized a motion to reopen post-conviction proceedings as a proper procedure for bringing an intellectual disability claim, see, e.g., Van Tran, 66 S.W.3d at 811-12, I have found no authority from this state recognizing a coram nobis petition as an appropriate procedural vehicle for asserting a claim of intellectual disability.  Indeed, this Court has suggested that a petition for post-conviction relief is the proper vehicle for claims of actual innocence based upon new scientific evidence, such as proof of I.Q.  See Dellinger v. State, 279 S.W.3d 282, 291 & n.7 (Tenn. 2009).  This Court has also emphasized that "coram nobis is an *extraordinary* procedural remedy" that "fills only a slight gap into which few cases fall."  State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999); see also Wlodarz v. State, 361 S.W.3d 490, 499 (Tenn. 2012). Moreover, coram nobis petitions are subject to a one-year statute of limitations that begins at the time the judgment of the trial court becomes final, although tolling may be available under limited circumstances. Mixon, 983 S.W.2d at 671; see also Workman, 41 S.W.3d at 103 (declining to dismiss as time-barred a coram nobis petition filed approximately thirteen months after the discovery of new evidence).  In short, the availability of coram nobis relief for the Petitioner's claim is doubtful.

Another possible avenue for relief is a declaratory judgment action.  In West v. Schofield, 380 S.W.3d 105, 107 (Tenn. Ct. App. 2012), the Court of Appeals implicitly recognized the propriety of using a declaratory judgment action to bring an execution protocol claim, noting that if the protocol is declared unconstitutional, the inmate can then seek a stay of execution.  In contrast, if a civil court granted the Petitioner a judgment declaring that he is intellectually disabled, the appropriate injunctive relief would be to modify his sentence to life imprisonment rather than to merely stay his execution.  See id. at 111 (noting that civil trial courts lack authority to grant injunctive relief that conflicts with a Tennessee Supreme Court order in a criminal case).  Further, because declaratory judgment actions challenging executions are against the state, sovereign immunity becomes an issue.  See Spencer v. Cardwell, 937 S.W.2d 422, 424 (Tenn. Ct. App. 1996).  Sovereign immunity would not preclude a declaratory judgment action challenging the constitutionality of an execution protocol statute, see Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 852-53 (Tenn. 2008) (holding that sovereign immunity does not bar a declaratory judgment claim against

(continued...)

U.S. 637, 644-45 (1998) (interpreting a habeas corpus statute so as to avoid the "far reaching and seemingly perverse" consequence of "bar[ring] the prisoner from ever obtaining . . . review" of a claim); Henderson v. Thaler, 626 F.3d 773, 788 (5th Cir. 2010) (Weiner, J., dissenting) ("If we were to condone the barring of [the petitioner's intellectual disability claim] . . . , without ever affording him a[n] . . . opportunity to demonstrate his intellectual disability, then allowing the State to execute him would not only be 'fundamentally unjust'; it would be unconstitutional per se.").

**B.**

In my opinion, Tennessee Code Annotated section 40-30-117(a)(2) can be reasonably interpreted in a way that avoids conflict with the due process rights of death row inmates. Unlike the majority, I believe that the term "offense," as used in section 40-30-117(a)(2), should be interpreted to encompass the offense of murder resulting in a sentence of death.

In the criminal context, the term "offense" is customarily equated with the term "crime," both of which refer generally to violations of the penal code. See Black's Law Dictionary 1186 (9th ed. 2009) (defining "offense" as "[a] violation of the law, a crime"); 22 C.J.S. Criminal Law § 3, at 4 (1989) ("The word 'offense' is usually used to describe a crime. . . . The terms 'crime,' 'offense,' and 'criminal offense' are all said to be synonymous, and ordinarily used interchangeably." (footnote omitted)). Historically, courts and commentators have defined offenses in terms of the essential facts—or elements—needed to impose or increase punishment. See Apprendi v. New Jersey, 530 U.S. 466, 501-18 (2000) (Thomas, J., concurring) (surveying "[a] long line of essentially uniform authority . . . stretching from the earliest reported cases after the founding until well into the 20th century" and concluding that such "authority establishes that a 'crime' includes every fact that is by law a basis for imposing or increasing punishment"). Under this view, identifying the elements of an offense requires an assessment of the facts that are necessary to impose a particular punishment. If a particular fact results in an increase in the statutory maximum punishment the court may impose, then that fact is an essential element of the

---

[5](...continued)
state officers to prevent the enforcement of an unconstitutional statute); however, the Petitioner would likely have to argue that his execution is unlawful because of his intellectual disability, not because any statute is unconstitutional. In light of these considerations, it is far from clear that a declaratory judgment action will provide a viable avenue for relief.

offense,[6] irrespective of the labels and technicalities of a particular statutory regime. Id. at 501 ("[I]f the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact[,] . . . the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime."); see also id. at 495 (majority opinion).

This understanding has been confirmed by recent United States Supreme Court cases addressing what constitutes an "offense" in the context of the death penalty. In Ring v. Arizona, 536 U.S. 584, 609 (2002), the Court held that Arizona's statutory death penalty scheme violated the defendant's Sixth Amendment right to a fair trial by allowing the sentencing judge, rather than the jury, to determine the existence of the aggravating factors necessary for imposition of the death penalty. Although the statutory aggravating factors in the Arizona penal code were technically sentencing considerations rather than part of the underlying first degree murder offense, the Court reasoned that the factors "operate[d] as 'the functional equivalent of an element of a greater offense,'" which required that they be found beyond a reasonable doubt by a jury, not a judge. Id. (quoting Apprendi, 530 U.S. at 494 n.19).

In Sattazahn v. Pennsylvania, 537 U.S. 101, 111-12 (2003), the Supreme Court reaffirmed this concept. "[I]n the context of capital-sentencing proceedings," the Court ruled, "the underlying offense of 'murder' is a distinct, lesser included offense of 'murder plus one or more aggravating circumstances.'" Id. at 111; see also id. at 112 ("'[M]urder plus one or more aggravating circumstances' is a separate offense from 'murder' *simpliciter*."). Applying this principle, the Court concluded that if a defendant is "acquitted" of aggravating circumstances in a prior trial, then "double-jeopardy protections attach to that 'acquittal' on the offense of 'murder plus aggravating circumstance(s).'" Id. at 112.[7]

---

[6] To illustrate, under our sentencing scheme, trial courts may sentence a defendant anywhere within the applicable sentencing range by considering any mitigating or enhancement factors. See generally State v. Bise, 380 S.W.3d 682 (Tenn. 2012). But because trial courts may not impose a sentence beyond the maximum of the statutory range based upon such factors, they do not qualify as elements or give rise to a distinct offense. Facts or circumstances that increase punishment beyond the statutory maximum—which do qualify as elements—must be found by a jury beyond a reasonable doubt. See Apprendi, 530 U.S. at 490.

[7] The Sixth Circuit Court of Appeals has also recognized the fact that in capital cases, the "offense" at issue encompasses any sentencing consideration necessary for imposition of the death penalty. See, e.g.,
(continued...)

Under Tennessee law, the facts necessary for imposing the death penalty include guilt of first degree murder, as defined by Tennessee Code Annotated section 39-13-202(a) (2010),[8] as well as at least one of the seventeen aggravating circumstances set out in Tennessee Code Annotated section 39-13-204(i) (2010). Absent at least one aggravating circumstance, the maximum statutory punishment for first degree murder is limited to life imprisonment.[9] Tenn. Code Ann. § 39-13-204(i). Hence, the fact of at least one aggravating circumstance is the element that distinguishes the offense of murder resulting in the death penalty from murder resulting in life imprisonment. See Sattazahn, 537 U.S. at 112. The decision of the General Assembly to place the aggravated circumstance requirement in a sentencing provision does not mean that it is not an element of the offense at issue or that murder resulting in the death penalty is not a distinct offense. See Apprendi, 530 U.S. at 495 ("[M]erely because the state legislature placed its hate crime sentence enhancer within the sentencing provisions of the criminal code does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense.").

The majority narrowly interprets the term "offense" as it is used in Tennessee Code Annotated section 40-30-117(a)(2), rejecting the Petitioner's argument that he should be permitted to reopen his post-conviction proceedings based upon new

---

[7](...continued)
Davis v. Mitchell, 318 F.3d 682, 687 (6th Cir. 2003) ("[A]ggravating factors . . . are the elements of the murder offense that make the defendant death eligible.").

[8] Tennessee Code Annotated section 39-13-202(a) defines first degree murder as:

(1) A premeditated and intentional killing of another;

(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy; or

(3) A killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

[9] The fact that the finding of an aggravating circumstance increases the maximum statutory punishment available distinguishes aggravating circumstances from more routine sentencing considerations, which may enhance a sentence within the applicable range but do not increase the maximum punishment to which a defendant may be subjected. Sentencing considerations within the latter category do not qualify as elements of the offense.

scientific evidence showing that he is actually innocent of the offense of "capital murder." In so doing, the majority observes that Tennessee Code Annotated section 39-13-202 defines first degree murder, whereas the procedures for sentencing a defendant convicted of first degree murder are set out in section 39-13-204. In light of this statutory scheme, the majority concludes that "[i]t is clear . . . that the underlying 'offense' is 'first degree murder,' and that the death penalty is a sentencing consideration rather than an independent offense."

The majority's conclusion hinges on the assumption that a fact proved at sentencing can never qualify as part of an offense. Consistent with the authorities discussed above, I would prefer to define offenses according to their elements. Because the "aggravating circumstance" requirement set out in Tennessee Code Annotated section 39-13-204(i) constitutes an element of the capital offense and must be proved beyond a reasonable doubt, in my view, murder resulting in the death penalty is a separate offense from murder resulting in life imprisonment. See Sattazahn, 537 U.S. at 112; Ring, 536 U.S. at 609; see also Apprendi, 530 U.S. at 501 (Thomas, J., concurring).

The majority also relies upon several federal cases construing the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Similar to Tennessee Code Annotated section 40-30-117(a)(2), the AEDPA contains provisions that bar claims for habeas corpus relief in "second or successive" petitions unless the petitioner can satisfy certain exceptions, one of which requires newly discovered evidence establishing that "no reasonable factfinder" would have found the petitioner "guilty of the offense," see 28 U.S.C. § 2255(h)(1) (2006), or "guilty of the underlying offense," see id. § 2244(b)(2)(B)(ii). Federal authorities, however, are not as uniformly supportive of the majority's position as the opinion suggests. In the first federal case cited by the majority, Henderson, 626 F.3d at 779-81, the Fifth Circuit declined to recognize an "actual innocence" exception to the AEDPA statute of limitations based upon an untimely claim of intellectual disability. Of note, Henderson had nothing to do with the AEDPA's provisions concerning successive petitions[10] and made no distinction between offenses and sentencing. Rather, the issue in that case was whether to apply the common law actual innocence exception to the AEDPA's statute of limitations, which, unlike Tennessee Code Annotated

_____

[10] In fact, the Fifth Circuit had granted Henderson permission to file a successive habeas petition in a prior decision. See In re Henderson, 462 F.3d 413, 417 (5th Cir. 2006).

section 40-30-117(a)(2), does not include an actual innocence provision. While the Fifth Circuit declined to recognize an actual innocence exception to the AEDPA's statute of limitations, a majority of the federal circuits that have considered the question have disagreed with the conclusion in Henderson. See Lee v. Lampert, 653 F.3d 929, 932 (9th Cir. 2011) (en banc); Sandoval v. Jones, 447 F. App'x 1, 4-5 (10th Cir. 2011); San Martin v. McNeil, 633 F.3d 1257, 1267-68 (11th Cir. 2011); Turner v. Romanowski, 409 F. App'x 922, 926 (6th Cir. 2011).

The majority also relies upon In re Dean, 341 F.3d 1247, 1248-49 (11th Cir. 2003), and Hope v. United States, 108 F.3d 119, 120 (7th Cir. 1997). These cases both involved successive habeas petitions seeking to collaterally attack non-capital sentences that had been enhanced by virtue of prior convictions. In each case, the court found that the statutory language "guilty of the offense" permitted challenges to the crimes of conviction but not to sentences. In re Dean, 341 F.3d at 1248-49; Hope, 108 F.3d at 120. But because these were non-capital cases involving sentencing enhancements that did not increase the maximum statutory punishment, they did not involve any fact proved at sentencing that qualified as an element of the offense at issue. As a result, these cases provide little guidance as to whether the term "offense" properly encompasses all elements of the offense at issue, even those, such as aggravating circumstances, which are found beyond a reasonable doubt by a jury during the sentencing phase. See Sawyer v. Whitley, 505 U.S. 333, 341 (1992) (explaining that "[i]n the context of a noncapital case, the concept of 'actual innocence' is easy to grasp," whereas "[i]t is more difficult to develop an analogous framework when dealing with a defendant who has been sentenced to death").

Admittedly, other cases have refused to allow successive habeas petitions asserting sentencing claims, even in death penalty cases. See, e.g., In re Webster, 605 F.3d 256, 257-59 (5th Cir. 2010); In re Jones, 137 F.3d 1271, 1274 (11th Cir. 1998).[11]

---

[11] Notably, in In re Webster, the court specified that it did not mean "to suggest that a prisoner is jurisdictionally barred from seeking successive review where he contests a factual predicate of his capital murder conviction, without which he would have been guilty only of non-capital murder." 605 F.3d at 258 n.5. As explained below, I believe the Petitioner's intellectual disability claim effectively contests his conviction for murder resulting in the death penalty because he has asserted a claim that, if proven, would remove the death penalty as an option.

Other federal cases rejecting successive habeas petitions in death penalty cases involve claims challenging execution protocol. See, e.g., In re Jones, 137 F.3d at 1274; Greenawalt v. Stewart, 105 F.3d

(continued...)

-12-

But federal courts are not in agreement on this issue. In Thompson v. Calderon, the Ninth Circuit, sitting en banc, specifically rejected an interpretation of the AEDPA that would categorically bar successive sentencing claims in capital cases. 151 F.3d 918, 923-24 & n.4 (9th Cir. 1998) (en banc). Without reference to the labels employed by the murder statute at issue, the court found that "the 'underlying offense' in a death penalty case is capital murder rather than merely homicide."[12] Id. at 924. Because Thompson had asserted a claim that, if proven, would negate the sole aggravating factor that made him eligible for the death penalty, the court found that he had stated a viable claim of actual innocence of the offense at issue. Id.; see also Babbitt v. Woodford, 177 F.3d 744, 746 (9th Cir. 1999) (per curiam) (stating that the AEDPA's actual innocence exception to the bar on successive claims "permit[s] a petitioner to establish by clear and convincing evidence that, 'but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law'" (quoting Thompson, 151 F.3d at 923)); Bryan A. Stevenson, The Politics of Fear and Death: Successive Problems in Capital Federal Habeas Corpus Cases, 77 N.Y.U. L. Rev. 699, 777 (2002) ("Some courts view [the AEDPA's actual innocence exception to the bar on successive claims] as necessarily including claims of innocence of the death penalty, while other courts read the provision much more narrowly as limited to claims of innocence of the crime. The decisions in the former, more protective category would seem to comport most closely with the available indicia of legislative intent." (footnotes omitted)).[13]

---

[11](...continued)
1287, 1288 (9th Cir. 1997) (per curiam). These cases are distinguishable from cases involving claims of intellectual disability because a successful execution protocol challenge only results in a stay of execution pending adoption of a lawful protocol, see Greenawalt, 105 F.3d at 1287, whereas a successful intellectual disability claim results in ineligibility for the death sentence. In other words, unlike intellectual disability, unlawful execution protocol at best delays rather than negates a sentence of death.

[12] In addition, rather than finding that the inclusion of the language "guilty of the underlying offense" was meant to provide a narrower exception than the common law actual innocence exception (as the majority concludes in this case), the court reasoned that the language was included because the AEDPA provisions pertaining to successive petitions, unlike the common law exception, "appl[y] to all habeas petitions, not just capital habeas petitions." Id. at 923-24.

[13] Other federal courts of appeals have recognized but declined to resolve the issue of whether the AEDPA's provisions on successive habeas petitions bar a claim premised on new evidence establishing ineligibility for the death penalty. See, e.g., Bryan v. Mullin, 100 F. App'x 783, 787 (10th Cir. 2004) (acknowledging that it is unclear "whether a challenge to the propriety of a death sentence is cognizable under § 2244(b)(2)(B)(ii)" but finding it unnecessary to "resolve that difficult question"); LaFevers v.
(continued...)

Unlike the majority, I would hold that the term "offense," as used in Tennessee Code Annotated section 40-30-117(a)(2), includes all elements of the offense in question, including the "aggravating circumstance" element in capital cases. In my assessment, the term "offense" encompasses murder resulting in the death penalty. This interpretation of the statute comports with the traditional understanding of what constitutes an offense and, of great importance, preserves the constitutionality of the statute by avoiding an interpretation that deprives death row inmates of a meaningful opportunity to present claims based upon newly discovered evidence of intellectual disability.

Reading the term "offense" in this manner, the question becomes whether demonstrating intellectual disability establishes actual innocence of the offense of murder resulting in the death penalty. I believe that it does. While intellectual disability does not directly contradict the elements of the offense (including any aggravating circumstances), it is incompatible with the imposition of a death sentence under Tennessee Code Annotated section 39-13-203, as well as our state and federal constitutions, effectively negating the "aggravating circumstance" element of the offense.

## II.

In summary, interpreting Tennessee Code Annotated section 40-30-117(a)(2) so as to bar the Petitioner's intellectual disability claim based upon new evidence conflicts with his right of due process by depriving him of a meaningful opportunity to establish ineligibility for the death sentence. A proper interpretation of the term "offense" in section 40-30-117(a)(2) encompasses all elements of the offense at issue, including the "aggravating circumstance" requirement for the imposition of a death sentence.

It may be that the Petitioner would ultimately be unable to satisfy the statutory requirements for demonstrating intellectual disability; however, to interpret section 40-30-117(a)(2) in a manner that deprives a petitioner of an evidentiary hearing and

---

[13](...continued)
Gibson, 238 F.3d 1263, 1267 (10th Cir. 2001) (same); In re Vial, 115 F.3d 1192, 1198 & n.12 (4th Cir. 1997) (en banc) (holding that the statutory exception to the bar on successive habeas petitions is generally unavailable to assert sentencing errors, but declining to address "the question of whether, under the AEDPA, an individual subject to a sentence of death may assert the existence of new evidence establishing that the sentence was imposed improperly").

an adjudication on the merits risks putting to death an intellectually disabled individual in violation of the state and federal constitutions.  I would, therefore, remand to the trial court for consideration of the merits of the intellectual disability claim.


_____

GARY R. WADE, CHIEF JUSTICE